**2013-1392**

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SUFFOLK TECHNOLOGIES, LLC,

*Plaintiff-Appellant*,

v.

AOL INC.,

*Defendant*,

v.

GOOGLE INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the Eastern District of Virginia in case no. 12-CV-0625, Judge T.S. Ellis, III.

## BRIEF OF PLAINTIFF-APPELLANT
## SUFFOLK TECHNOLOGIES, LLC

Roderick G. Dorman
*Principal Attorney*
McKOOL SMITH HENNIGAN, P.C.
865 Figueroa, Suite 2900
Los Angeles, CA 90017
(213) 694-1200

Joel L. Thollander
McKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas 78701
(512) 692-8700

Douglas A. Cawley
Daniel L. Geyser
McKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4000
*Attorneys for Plaintiff-Appellant*

July 29, 2013

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Suffolk Technologies, LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

Suffolk Technologies, LLC.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Suffolk Technologies, LLC.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Suffolk Technologies, LLC is a wholly owned subsidiary of Corporate Research Partners, which in turn is a wholly owned subsidiary of IPValue Management, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**MCKOOL SMITH HENNIGAN P.C.:**  Roderick G. Dorman; Jeanne Irving; Alan P. Block; Jeffrey Huang

**MCKOOL SMITH P.C.:** Douglas A. Cawley; Joel L. Thollander; Daniel L. Geyser; J. Austin Curry (participated in trial court only; now of Caldwell Cassady & Curry)

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ...................................................x

I.    STATEMENT OF JURISDICTION ..............................................1

II.   STATEMENT OF THE ISSUES ...................................................1

III.  STATEMENT OF THE CASE ......................................................2

IV.   STATEMENT OF THE FACTS .....................................................4

    A.    The '835 Patent Discloses Customizing Files in Dependence Upon an Originating Web Page.......................................4

    B.    Suffolk Sues Google for Infringing the '835 Patent. ....................................................................................7

    C.    Google Finds Alleged Prior Art in Its Own Storage Facilities. .......................................................................8

    D.    The District Court Construes the Disputed Claim Terms. ............................................................................9

    E.    Rhyne Offers an Expert Validity Opinion; It Is Excluded. .........................................................................11

    F.    Weinstein Offers an Expert Damages Opinion; It Is Excluded. .......................................................................11

    G.    The District Court Enters Judgment; This Appeal Follows. ..........................................................................12

V.    SUMMARY OF THE ARGUMENT ...........................................13

VI.   STANDARDS OF REVIEW .......................................................17

VII.  ARGUMENT ...............................................................................18

A.    The District Court Erred in Construing the Claim Term "generating said supplied file." ..................................18

    1.    The construction initially urged by both parties comports with the intrinsic record.................................18

    2.    The construction adopted by the district court conflicts with the intrinsic record. ...................................20

B.    The District Court Erred In Concluding That Gundavaram Anticipates the Asserted Claims of the '835 Patent.......................................................................27

    1.    The Gundavaram post is not a "printed publication" under Section 102..................................27

    2.    Serious questions undermining the reliability and accuracy of the Gundavaram post should have been submitted to the jury. ...................................33

    3.    Rhyne's expert validity testimony should not have been excluded.............................................36

    4.    Even without Rhyne's testimony, summary judgment of invalidity should not have been granted.......................................................................41

C.    The District Court Erred in Excluding the Testimony of Suffolk's Damages Expert............................................44

    1.    Weinstein's determination of the invention's footprint in the marketplace is consistent with *Uniloc*..................................................................46

    2.    Weinstein's application of the NBS to the invention's footprint in the marketplace is consistent with *Uniloc*..............................................48

VIII.  CONCLUSION AND RELIEF REQUESTED...........................................56

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
    616 F.3d 1283 (Fed. Cir. 2010) ..........................................................25

*Amakua Dev. LLC v. Warner*, No. 05-CV-3082,
    2007 U.S. Dist. LEXIS 49952 (N.D. Ill. July 10, 2007) ....................51

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................33

*August Tech. Corp. v. Camtek, Ltd.*,
    655 F.3d 1278 (Fed. Cir. 2011) ..........................................................32

*Becton Dickinson & Co. v. Syntron Bioresearch, Inc.*, No. 97-CV-1634,
    1998 U.S. Dist. LEXIS 22082 (S.D. Cal. Dec. 19, 1998) ..................38

*Bell Atl. Network Servs. v. Covad Commc'ns Group*,
    262 F.3d 1258 (Fed. Cir. 2001) .....................................................23, 24

*Bruckelmyer v. Ground Heaters, Inc.*,
    445 F.3d 1374 (Fed. Cir. 2006) ..........................................................30

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*,
    183 F.3d 1334 (Fed. Cir. 1999) ..........................................................27

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*,
    291 F.3d 1317 (Fed. Cir. 2002) ..........................................................17

*Cordis Corp. v. Boston Scientific Corp.*,
    561 F.3d 1319 (Fed. Cir. 2009) .....................................................30, 41

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) ..........................................17

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)..................................................................44, 49, 50

*Grand River Enters. Six Nations v. King*, No. 02-CV-5068,
    2011 U.S. Dist. LEXIS 27424 (S.D.N.Y. Mar. 17, 2011)..................52

*Holmer v. Harari*,
    681 F.3d 1351 (Fed. Cir. 2012) ..........................................................27

*Hoyle v. Freightliner, LLC*,
    650 F.3d 321 (4th Cir. 2011) .............................................................39

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed Cir. 2010) ......................................................44, 46

*In re Cronyn*,
    890 F.2d 1158 (Fed. Cir. 1989) ...............................................28, 29, 30

*In re Hall*,
    781 F.2d 897 (Fed. Cir. 1986) ...........................................................28

*In re Klopfenstein*,
    380 F.3d 1345 (Fed. Cir. 2004) .......................................18, 28, 31, 32

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009) ....................................................28, 29

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ........................................................43

*In re Tenney*,
    254 F.2d 619 (C.C.P.A. 1958) ..........................................................31

*In re Wyer*,
    655 F.2d 221 (C.C.P.A. 1981) ..........................................................30

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004) .........................................................23

*Itron, Inc. v. Benghiat*, No. 99-CV-501,
    2001 U.S. Dist. LEXIS 23230 (D. Minn. Dec. 21, 2001) ..................38

*Jockmus v. Leviton*,
    28 F.2d 812 (2d Cir. 1928) ...............................................................32

*Keach v. U.S. Trust Co.*,
    419 F.3d 626 (7th Cir. 2005) .............................................................41

*Kyocera Wireless Corp. v. ITC*,
    545 F.3d 1340 (Fed. Cir. 2008) ..................................................30, 43

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011).............................................................33

*Minebea Co. v. Papst*, No. 97-CV-590,
    2005 U.S. Dist. LEXIS 11946 (D.D.C. June 21, 2005).....................................51

*MIT v. AB Fortia*,
    774 F.2d 1104 (Fed. Cir. 1985) .........................................................31

*Nicholas v. Pa. State Univ.*,
    227 F.3d 133 (3d Cir. 2000) .............................................................41

*Novak v. Tucows, Inc.*, No. 06-CV-1909,
    2007 U.S. Dist. LEXIS 21269 (E.D.N.Y. Mar. 26, 2007)................................34

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) .........................................................25

*Oracle Am., Inc. v. Google Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011).............................................52

*Osram Sylvania, Inc. v. Am. Induction Techs., Inc.*,
    701 F.3d 698 (Fed. Cir. 2012) .........................................................44

*Pfaff v. Wells Elecs., Inc.*,
    525 U.S. 55 (1998)........................................................................31

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................19, 20, 22, 23

*Praxair, Inc. v. ATMI, Inc.*,
    543 F.3d 1306 (Fed. Cir. 2008) .......................................................17

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
    536 F.3d 1256 (Fed. Cir. 2008) .......................................................48

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc., USA*,
    No. 07-CV-6855, 2011 U.S. Dist. LEXIS 10512 (D.N.J. Feb. 3, 2011)............52

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
    242 F.3d 1337 (Fed. Cir. 2001) .......................................................................23

*SEB S.A. v. Montgomery Ward & Co.*,
    594 F.3d 1360 (Fed. Cir. 2010) .......................................................................25

*Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
    318 F.3d 592 (4th Cir. 2003) ...........................................................18, 37, 39, 41

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*,
    511 F.3d 1186 (Fed. Cir. 2008) .................................................................17, 31

*Suffolk Techs. LLC v. Aol Inc.*, No. 1:12-CV-625,
    2013 U.S. Dist. LEXIS 64630 (E.D. Va. Apr. 12, 2013) ...................................3

*Toro Co. v. White Consol. Indus.*,
    199 F.3d 1295 (Fed. Cir. 1999) .......................................................................23

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011) .......................................................................23

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..................................................................passim

*United States v. Caldwell*,
    776 F.2d 989 (11th Cir. 1985) .........................................................................34

*United States v. Vidacak*,
    553 F.3d 344 (4th Cir. 2009) ...........................................................................34

*VirnetX Inc. v. Apple Inc.*, No. 6:10-CV-417,
    2013 U.S. Dist. LEXIS 35631 (E.D. Tex. Feb. 26, 2013)................................52

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................................25, 27

*Voter Verified, Inc. v. Premier Election Solutions, Inc.*,
    698 F.3d 1374 (Fed. Cir. 2012) .......................................................................32

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ...........................................................................18

*WMTC, Inc. v. G.A. Braun, Inc.*,
    247 F.3d 114 (4th Cir. 2001) ...............................................................27


## STATUTES

35 U.S.C. § 102 ...........................................................................passim

28 U.S.C. § 1295 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1338 ..................................................................................1

28 U.S.C. § 2107 ..................................................................................1


## OTHER AUTHORITIES

FED. R. APP. P. 4 ..................................................................................1

FED. R. CIV. P. 37 ...............................................................18, 37, 41

FED. R. EVID. 702 ......................................................................passim

FED. R. EVID. 901 ..............................................................................34

11 James Wm. Moore, *Moore's Federal Practice* 1 56.40[1][c] (2011 ed.)...........33

Chester C. McGuire, *Simulation Modeling in Forensic Economics: The Example of Reasonable Royalty Negotiations*, LITIGATION ECONOMICS DIGEST (1999) ...................................................................................51

Elizabeth M. Bailey, Gregory K. Leonard, Mario A. Lopez, *Making Sense of 'Apportionment' in Patent Damages*, THE COLUMBIA SCIENCE AND TECHNOLOGY LAW REVIEW, Vol. 12 (2011).......................................51

John C. Jarosz & Michael J. Chapman, *Application of Game Theory to Intellectual Property Royalty Negotiations, in* LICENSING BEST PRACTICES (Robert Goldscheider & Alan H. Gordon, eds. 2006)......................51

Jonathan D. Putnam, *Bargaining and the Construction of Economically Consistent Hypothetical License Negotiations*, THE LICENSING JOURNAL (2004) ............................................................................................................50

Mark A. Lemley & Carl Shapiro, *Frontiers of Intellectual Property: Patent Holdup and Royalty Stacking*, 85 TEXAS LAW REVIEW 1991 (2007) .................51

Richard Toikka, *Patent Licensing Under Competitive and Non-Competitive Conditions*, 82 J. PAT. & TRADEMARK OFF. SOC'Y 279 (2000) .........................54

T. Paul Tanpitukpongse & Kanav Hasija, *Game Theory: A Zooming and Sliding Method for the Determination of Reasonable Royalties in Patent Damages*, THE INAUGURAL SAMSUNG-STANFORD CONFERENCE ON PATENT REMEDIES (2011) ...................................................................................51

William Choi & David Stein, *Economic Gains from Licensing as an Estimate of the Reasonable Royalty*, AMERICAN BAR ASSOCIATION, SECTION OF INTELLECTUAL PROPERTY LAW, 27TH ANNUAL INTELLECTUAL PROPERTY LAW CONFERENCE (2011) ...................................................................51

William Choi & Roy Weinstein, *An Analytical Solution to Reasonable Royalty Rate Calculations*, THE JOURNAL OF LAW AND TECHNOLOGY, Vol. 41, No. 1 (2001) .........................................................................................51

## STATEMENT OF RELATED CASES

Pursuant to FED. CIR. R. 47.5, Plaintiff-Appellant Suffolk Technologies, LLC ("Suffolk") notes that:

(a) there have been no other previous appeals in this case; and

(b) there are no cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

# I.  STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and this Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a). The notice of appeal from the April 18, 2013 final judgment was timely filed under 28 U.S.C. § 2107(a) and FED. R. APP. P. 4(a) on May 3, 2013. JA1-3; JA111.

# II.    STATEMENT OF THE ISSUES

**Issue 1:** Whether the district court erred in construing the term "generating said supplied file" when the court rejected the proposal initially urged by both parties—requiring that the supplied file be tailored "in dependence upon the originating file"—and instead adopted a construction that: a) ignores the implicit definition provided by the specification; and b) effectively excludes the preferred embodiment that this claim language was expressly intended to cover.

**Issue 2**:  Whether the district court erred in granting summary judgment of invalidity by: a) holding that an insufficiently accessible post in Usenet newsgroup constituted a "printed publication" under 35 U.S.C. § 102; b) declining to submit serious questions regarding that post's accuracy and reliability to the jury—even though Google reproduced the post from its own database, the post was altered from its original format, no one could attest how the post was preserved for years before Google acquired it, and no one could specifically verify the post's authenticity; c) excluding Suffolk's supplemental expert report as providing an

"untimely" validity opinion with respect to the post—even though the report was directly responsive to the court's *Markman* order and was submitted under the court's own schedule for post-*Markman* supplemental reports; and d) deeming Google's invalidity theory "unrebutted"—even though Suffolk showed that the post lacked elements required by the court's claim constructions.

**Issue 3:** Whether the district court erred in excluding the testimony of Suffolk's damages expert when that exclusion rested on: a) a misreading of this Court's decision in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011); and b) a misunderstanding of the "Nash Bargaining Solution."

## III.   STATEMENT OF THE CASE

U.S. Patent No. 6,081,835 (the "'835 patent") discloses and claims methods of controlling a server that supplies files to computers rendering web pages on the Internet. JA46-49. These methods include a preferred embodiment in which the server supplies a customized file tailored to the web page from which the file request originated. JA47. Thus, for example, if a browser "requests a HTML file and generates a web page which includes details of a company," the server generates a customized file "in dependence upon the current web page being displayed by the browser"—a file including, for example, "financial information … tailored to suit the originating web page." JA47(4:2-10).

In June 2012, Suffolk brought this suit against AOL Inc. and Google Inc., alleging that both defendants infringed the '835 patent. JA59. Suffolk settled its claims against AOL in January 2013, leaving Google as the only remaining defendant. JA10; JA83. Over the following months, the district court entered a series of orders limiting the scope of the '835 patent and preventing Suffolk from presenting its case to the jury. The court first construed the "generating said supplied file" claim term so as to effectively ignore its implicit definition in the specification and exclude the preferred embodiment it was intended to cover. JA23-24. The court then excluded the supplemental report of Suffolk's validity expert—even though his post-*Markman* opinions turned directly upon the court's *Markman* order. JA30. The court next determined that an obscure post in a non-indexed, non-searchable Usenet group—produced and reformatted from a Google storage facility—was invalidating prior art for three of the four asserted '835 patent claims. JA26-29. Finally, the court excluded the report of Suffolk's damages expert on the ground that a final step in his case-specific analysis—employing a widely accepted and scientifically rigorous methodology lauded by the Nobel prize committee—was "indistinguishable" from the arbitrary methodology rejected in *Uniloc*. JA34-36; *Suffolk Techs. LLC v. Aol Inc.*, No. 1:12-CV-625, 2013 U.S. Dist. LEXIS 64630, at *4-6 (E.D. Va. Apr. 12, 2013).

These rulings left standing only claim 6 of the '835 patent—which covers the preferred embodiment referenced above. JA49. But Suffolk determined that the district court's erroneous construction of that claim's "generating said supplied file" term, in combination with the court's erroneous prior art and summary judgment rulings, effectively ensured that this claim would be invalidated as well. JA5-6. Thus, while "expressly reserving all objections and opposition for appeal," Suffolk stipulated to a judgment of invalidity for claim 6. JA6; JA24. Final judgment was then entered, and this appeal followed. JA1-3; JA111-13.

## IV.    STATEMENT OF THE FACTS

### A.    The '835 Patent Discloses Customizing Files in Dependence Upon an Originating Web Page.

Before filing the original application for the '835 patent in April 1996, British Telecom PLC ("BT") had a problem: unscrupulous individuals would access BT servers over the Internet, purloin BT's official logo, and display that logo on a web page disparaging BT. JA11. Stuart Antcliff and John Regnault, accomplished BT scientists, recognized the problem and invented a novel method for limiting access to BT's servers to authorized computers. JA11. In the process of solving that problem, the two inventors collaborated with Laurence Bradley, who had been developing concepts for customized Internet commerce. JA4311-15. Together these co-inventors recognized that the initial solution for restricting access to files on a server could be expanded to include creating and supplying

4

customized files tailored to the web page requesting the file. JA47-48. Thus, for example, upon request from "a web page which includes details of a company," the server could supply a file with customized "financial information" generated "in dependence upon the current web page being displayed by the browser." JA47(4:2-10). The '835 patent describes and claims this significant invention. JA47-48.

As the patent explains, the World Wide Web is comprised of servers that communicate with each other using the HyperText Transfer Protocol ("HTTP") and HyperText Mark-up Language ("HTML"). JA46. Internet users interact with these servers through browsers that render the HTML communications into web pages displayed on a local computer. JA46. While a fully rendered web page may appear as a single document, its various components—such as text, graphics, or sounds—may represent distinct files received from multiple servers. JA46-47. The browser assembles these components with directions from the "originating web page"—an initial file received from a first server—which provides instructions for retrieving any files needed from other servers. JA46-47. These files are typically identified by a "URL"—"universal resource locator"—which provides, among other things, the file name and the address for the server where the file is located. JA46. When the browser is instructed by an originating web page to retrieve such a file, it sends a request to the identified server, which then supplies the requested file for the browser to incorporate into the rendered web page. JA46; JA4006-09.

The inventors "realized that the HTTP protocol provides that the URL of the HTML file which refers to any image or digitized sound file is included as a 'referrer' address when a request for a file is made to an internal server." JA47(3:36-40). This allowed "the possibility of identifying a first server which is trying to incorporate graphics files from a second server." JA47(3:49-51). And by "interrogating the referrer address, a second server is able to control access to the requested files. This enables the second server to prevent the files being sent." JA47(3:51-54). The inventors thereby solved BT's purloined-logo problem. JA11.

But they did not stop there. They understood that preventing a file from being sent was not the only option; the second server could instead supply a file—a "dummy file," for example, JA48(5:32), or perhaps "the same file as requested," JA49(7:46-47). And inspired by the insights of co-inventor Bradley, they further recognized that the file supplied could be customized so that the second server would have "an appearance of having some 'intelligence,'" JA48(6:52-53)—after processing a request from an originating file, the supplied file could be contextually tailored in dependence upon the originating file itself. JA47(4:2-10):

> In addition to the possibility of controlling access to image or sound, or other high bandwidth files, the referrer details transmitted with the file request may inform the server of the web page from which a file request is being made. Thus, if a HTML file is requested from a web page, the server is able to *identify from which web page the HTML file request is made and customise the HTML file accordingly*. For instance, if the browser requests a HTML file and *generates a web page which includes details of a company*, the details which are to be

displayed *can be tailored in dependence upon the current web page being displayed by the browser which could for instance be financial information*. The HTML file then transmitted to the browser could be selected from amongst a library of HTML files or specifically *generated or tailored to suit the originating web page*.

JA47(3:62-4:10) (emphasis added). These insights were captured in claims 1 and 6 of the '835 patent:

> 1. A method of operating a file server, said method comprising the steps of:
>> receiving a request for a file;
>> determining if the request includes a received identification signal identifying an originating file from which said request originated;
>> comparing any said received identification signal with one or more predetermined identification signals; and
>> deciding which file, if any, is to be supplied in dependence upon said determining and comparing steps, and if in the deciding step it is decided that a file is to be supplied, supplying said file.
>
> …
>
> 6. A method as in claim 1 wherein said deciding step further comprises generating said supplied file.

JA49; *see also* JA47(3:14-18); JA48(6:50-53); JA43(Fig. 5).

## B.    Suffolk Sues Google for Infringing the '835 Patent.

The '835 patent was assigned to BT upon issuance in 2000. JA37. BT then assigned the patent to IPValue Management, Inc. ("IPValue")—BT's longstanding agent in enforcing BT's patent rights. JA116-18. As consideration, BT received an economic-participation interest in proceeds from the '835 patent. JA117. IPValue subsequently assigned the patent to Suffolk, its wholly owned subsidiary. JA12. In

June 2012, Suffolk brought this suit against AOL and Google for infringing the '835 patent. JA59. Suffolk settled its claims against AOL in January 2013, leaving Google as the only remaining defendant. JA10. Four claims of the '835 patent are currently asserted against Google: claims 1, 6, 7, and 9. JA5.

## C.    Google Finds Alleged Prior Art in Its Own Storage Facilities.

After scouring the prior art for any reference that might possibly support its invalidity defense, Google finally stumbled across something in one of its own storage facilities: a message from a Usenet newsgroup allegedly posted in 1995 by Shishir Gundavaram. JA27. As shown by Google's own evidence, this was a posting to an informal discussion, populated mostly by "beginners," with "no quick way to actually look through a particular topic"; there was no evidence that these "hundreds or thousands" of posts, within each newsgroup, were indexed or arranged in any searchable format. JA5130-33; JA5118; JA5148 (posts were "sorted in order of the date").

Furthermore, the so-called "Gundavaram post," as submitted by Google, was *not even the Gundavaram post*. It was instead a pseudo-replica, created and reformatted from Google's own storage facilities—which Google obtained from unconfirmed sources years after the alleged posting. JA5130-32; JA5118. And while Gundavaram testified in deposition that he believed he authored the message

8

("with a small caveat"), he had no specific recollection of "the exact post," "exactly writing that code," or posting it. JA5130; JA5135-36.

The district court nevertheless concluded that the Gundavaram post was not only admissible, but "clear and convincing" evidence supporting summary judgment of invalidity—foreclosing the jury's consideration of the issue. JA26-27.

**D.    The District Court Construes the Disputed Claim Terms.**

Meanwhile, the district court also construed the patent's disputed claim terms. JA9. Two constructions are particularly relevant here.

First, the court construed "generating said supplied file"—the central limitation of claim 6, which covers the '835 patent's critical customization embodiment—as "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal." JA9.

Google had initially proposed construing this term as "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the originating file." JA4024-25. Suffolk's proposal had been virtually identical—"creating a file to be served that is customized in dependence upon the originating file." JA4134. Both proposals were drawn directly from the specification, which repeatedly states that the customized file is tailored in dependence upon the originating web page. JA47(4:5-6) ("tailored in dependence upon the current web page being displayed by the browser"); JA47(4:9-10) ("tailored to suit the originating web page");

JA48(6:37-39) ("customised in dependence upon the web page from which the request for a new web page was made"); JA48(6:51-52) ("customise the web page displayed at a browser in dependence upon the previous web page").

Because these proposals were functionally equivalent, Suffolk agreed to adopt Google's formulation. JA4151-54. But after deposing Suffolk's expert on validity and infringement, Google decided that it no longer liked its own definition, JA4151-52, and abandoned it for something new: "creating or tailoring a file, as distinct from selecting an existing file, *in dependence upon the received identification signal* identifying an originating file." JA4134 (emphasis added). Notwithstanding the fact that the specification repeatedly describes the "tailoring" as dependent upon the originating web page—and not the received identification signal, JA47-48—the district court held that the claim language itself required a construction closer to Google's post-discovery proposal. JA22.

Second, the court construed "identification signal" as "digital information that identifies the source, origin, or location of a file." JA9. This construction— previously advanced by neither party, JA4153—was significant because it provided an additional basis (ignored by the district court) to find that Gundavaram did not anticipate any of the asserted claims. JA28.

**E.    Rhyne Offers an Expert Validity Opinion; It Is Excluded.**

After the district court issued this construction, Suffolk submitted a supplemental report from its validity expert, V. Thomas Rhyne. JA28. The report was served by the deadline for post-*Markman* supplementation, and was directly responsive to the new construction of "identification signal." JA52; JA12026. In particular, Rhyne opined that this construction precluded finding that Gundavaram anticipated claim 1 of the '835 patent. JA12459. Notwithstanding that Rhyne had no occasion to offer this post-*Markman* validity opinion before the district court's *Markman* order, the court struck Rhyne's supplemental report as untimely. JA28.

**F.    Weinstein Offers an Expert Damages Opinion; It Is Excluded.**

The district court also struck the report of Suffolk's damages expert, Roy Weinstein. JA34-36. Weinstein's damages opinion involved two fundamental steps. JA9807-10. The first was to measure, in conjunction with a *Georgia-Pacific* analysis, incremental profits attributable solely to Google's use of the patented technology over the next best alternative. JA9781-809; JA10075; JA10009-10. The second was to determine how the parties would have agreed to split these patent-specific incremental profits in a hypothetical negotiation. JA9808-09. Weinstein offered two ways of finding this split: 1) an application of the "Nash Bargaining Solution" ("NBS")—the standard economic model for calculating negotiation outcomes, named for John Nash and related to his work that earned the 1994 Nobel

prize in economic sciences, JA9773-74; JA9809-10; and 2) an alternative analysis that reflected profit-splits Google had accepted in previous agreements. JA9810.

Google's expert contested some of Weinstein's assumptions and calculations, but conceded that his fundamental methodology was conceptually sound and tracked her own approach to determining damages. JA9638-39. The district court nevertheless excluded Weinstein's testimony in its entirety—including the *Georgia-Pacific* and alternative profit-split analyses—on the ground that the acclaimed and scientifically rigorous NBS was "indistinguishable" from the essentially arbitrary 25% rule of thumb rejected in *Uniloc*. JA36.

## G.    The District Court Enters Judgment; This Appeal Follows.

Based on its rulings relating to the Gundavaram post and the exclusion of Rhyne's expert testimony, the district court entered summary judgment that claims 1, 7, and 9 of the '835 patent were invalid as anticipated by Gundavaram. JA2-6. Suffolk determined that, in light of these holdings, the court's erroneous construction of claim 6's "generating said supplied file" term effectively ensured that this claim would be invalidated as well. JA5-6. Thus, while "reserving all objections and opposition for appeal," Suffolk stipulated to a judgment of invalidity for claim 6. JA6; JA24. Because this disposed of all remaining issues in the case, final judgment was entered. JA3. This appeal followed. JA111-13.

## V.    SUMMARY OF THE ARGUMENT

**A.**    The district court erred in construing the claim term "generating said supplied file." JA49. Google initially proposed construing this term as "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the originating file." JA4024-25. Suffolk agreed. JA4151-54. But after additional discovery, Google jettisoned its original definition in favor of something new: now, it proposed, the term required "tailoring … in dependence upon the received identification signal …." JA4134; JA4151-52.

In construing the term along the lines of Google's new proposal, the district court committed three fundamental errors. First, it erred in finding that "the language of the claims themselves" required this construction. JA22. Second, it erred in ignoring the specification's implicit definition for the "generating" term, which was reflected in both parties' initial construction. JA24; JA4024-25. Third, it erred in adopting a construction that effectively excludes the preferred embodiment that this claim language was intended to cover. JA23-24; JA48; JA49.

The district court's construction should thus be reversed, and the summary judgment of invalidity upon which it is based should be vacated.

**B.**    The district court also erred in granting summary judgment of invalidity, finding that the Gundavaram post was prior art, that three asserted claims were anticipated by Gundavaram, and that Google's showing of invalidity

13

was "substantial and unrebutted." The court's analysis was flawed for four independent reasons, each separately requiring reversal.

First, the Gundavaram post is not a "printed publication" under 35 U.S.C. § 102: a cursory message posted on an informal Usenet group, populated mostly by "beginners," in a non-indexed, non-searchable format, bears none of the hallmarks associated with a "printed publication." It does not provide the meaningful public dissemination to people of ordinary skill in the art that is necessary before a patent becomes *unnecessary* to promote public disclosure. The district court's sweeping view of Section 102 would expand "printed publication" beyond its intended scope and frustrate the delicate balance struck by Congress in the patent scheme.

Second, as submitted by Google, the Gundavaram post is *not even the Gundavaram post*. This document did not exist in 1995—it is an alleged replica of some writing, generated and reformatted from Google's own database, which Google first obtained from unconfirmed sources years after the alleged posting. Suffolk controverted Google's proof of the reliability and accuracy of this so-called prior art, issues which Google must establish by *clear and convincing* evidence. The district court erred in finding—without a trial—that no rational juror could doubt the integrity of Google's "evidence" under that demanding standard.

Third, after the court's *Markman* ruling, Suffolk served a supplemental expert report (by the court-ordered deadline) that disproved Google's anticipation

theory. Rhyne's report analyzed the court's new claim construction—which rejected the views of *both* parties—and offered an opinion on Gundavaram and claim 1 that was unavailable and unpredictable before the court's ruling. The district court nevertheless excluded this report on the ground that Rhyne had not previously opined on the subject. This ruling has no basis in law or logic: the court's novel claim construction generated issues that *previously did not exist*, and Suffolk acted at the first available opportunity for responding to the court's order. The fact that Rhyne had not previously issued a defunct opinion (based on rejected proposals) is no reason to exclude a now-pertinent opinion introduced at the earliest possible time. This error was the essential underpinning of the district court's grant of summary judgment, and the court's rationale was incompatible with the Federal Rules and the Fourth Circuit's controlling legal framework.

Fourth, even without that expert report—and even accepting Gundavaram as legitimate prior art—the district court still erred in granting summary judgment and removing this issue from the jury. Anticipation under Section 102 is a fact question, and Suffolk made clear why Gundavaram could not anticipate claim 1 under the court's construction of "identification signal." Even without Suffolk's own expert, Google must still carry *its* burden—under the clear and convincing threshold—by proving its case at trial and withstanding Suffolk's cross-examination. Google did not irrefutably prove that Gundavaram anticipates each

and every element of the asserted claims of the '835 patent, and there is no reason that Google's theories could not be scrutinized and rebutted during Google's affirmative presentation at trial.

**C.** The district court further erred in excluding the testimony of Suffolk's damages expert. Weinstein's approach to calculating damages involved two overarching steps. JA9807-10. The first step measured, in conjunction with an analysis under the *Georgia-Pacific* factors, incremental profits attributable solely to Google's use of the patented technology over the next best technology. JA9781-809; JA10075. The second determined how the parties would have split these patent-specific incremental profits in a negotiation. JA9808-09. Weinstein offered two possibilities: 1) an application of the NBS that led to an even split of these incremental profits, and 2) an alternative analysis reflecting profit splits Google had previously accepted. JA9809-10. The district court never questioned the first-step *Georgia-Pacific* analysis or the second-step alternative profit-split analysis. It nevertheless excluded all of Weinstein's testimony because—according to the court—Weinstein's use of the NBS was precluded by *Uniloc*, 632 F.3d at 1318. JA34-36. In so holding, the court committed two fundamental errors.

First, the court erred in extending its order to exclude Weinstein's use of the *Georgia-Pacific* factors to determine the patented invention's specific footprint in the marketplace. JA34-36. This analysis indisputably comports with the Court's

16

opinion in *Uniloc*, 632 F.3d at 1317. Second, the court erred in concluding that the NBS "is indistinguishable from the 25% rule of thumb rejected in *Uniloc*." JA36. In stark contrast to the arbitrary 25% rule of thumb, the NBS is good science; it is necessarily tied to the facts of the case; and Weinstein reliably applied the NBS to the specific facts of this case. *See* FED. R. EVID. 702.

## VI.    STANDARDS OF REVIEW

The district court's claim construction is subject to de novo review. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998) (en banc).[1]

The Court "reviews a district court's grant of summary judgment without deference, reapplying the same standard as the district court." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008) (summary judgment of invalidity subject to full de novo review). "Whether an asserted anticipatory document qualifies as a 'printed publication' under § 102 is a legal conclusion based on underlying factual determinations." *Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002). "Where no facts are in dispute, the

---

[1] Suffolk acknowledges that *Cybor* will be the subject of *en banc* review in *Lighting Ballast Control v. Philips Electronics North America*. But even if this Court ultimately adopts a different and more deferential standard for reviewing claim constructions, the construction at issue should still be reversed, as it is clearly erroneous and contrary to established precedent.

question of whether a reference represents a 'printed publication' is a question of law." *In re Klopfenstein*, 380 F.3d 1345, 1347 (Fed. Cir. 2004).

The district court's exclusion of expert testimony is subject to review for abuse of discretion. *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (addressing exclusion under FED. R. CIV. P. 37); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (addressing exclusion under FED. R. EVID. 702). A district court abuses its discretion "if its conclusion is guided by erroneous legal principles … or rests upon a clearly erroneous factual finding." *Westberry*, 178 F.3d at 261. In reviewing for abuse of discretion, "[t]his [C]ourt is obligated to review the record and reasons offered by the district court and to reverse if the [C]ourt has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Id.* (internal quotation marks omitted).

## VII.  ARGUMENT

**A.  The District Court Erred in Construing the Claim Term "generating said supplied file."**

### 1.    The construction initially urged by both parties comports with the intrinsic record.

The term "generating said supplied file" is found in claim 6 of the '835 patent. JA49. This claim covers a preferred embodiment that "allow[s] a server to customise the web page displayed," thus giving "the server an appearance of

having some 'intelligence.'" JA48(6:50-54). The proper construction of the "generating" claim term—as Google initially proposed and agreed—is "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the originating file." JA4024-25; JA4126-38. Google's proposal was well-founded; indeed, it was taken directly from the specification:

> [I]f the browser requests a HTML file and *generates a web page which includes details of a company*, the details which are to be displayed can be *tailored in dependence upon the current web page being displayed by the browser* which could for instance be financial information. The HTML file then transmitted to the browser could be selected from amongst a library of HTML files or specifically *generated or tailored to suit the originating web page*.

JA47(4:2-10) (emphasis added). And again:

> [T]he HTML file sent to the browser can be customised *in dependence upon the web page from which the request for a new web page was made*.

JA48(6:36-39) (emphasis added).

Where the specification describes the preferred embodiments in the context of an "originating web page," the claims use the broader term "originating file." JA47(4:10); JA49(7:35). The construction of "generating said supplied file" that best comports with the claim language read in light of the specification is thus "creating or tailoring a file, as distinct from selecting an existing file, *in dependence upon the originating file*." JA4024-27 (emphasis added); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) ("claims must be

construed so as to be consistent with the specification, of which they are a part"); *see also id.* at 1315 ("Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term.").

As noted, this was Google's initial proposed construction of the term. JA4128. Suffolk's initial proposed construction was virtually identical—"creating a file to be served that is customised in dependence upon the originating file." JA4134. Expecting to avoid further dispute on this term, Suffolk agreed to adopt Google's proposed construction. JA4151-54. But after additional discovery, Google decided that it no longer cared for its own definition. JA4151-52. It then proposed that, rather than "tailoring … *in dependence upon the originating file*," the "generating" claim language required "tailoring … *in dependence upon the received identification signal* …." JA4134 (emphasis added); JA4151-54. Google's surrogate proposal—motivated by strategic considerations—is inconsistent with the specification, and the district court erred in adopting it.

### 2.    The construction adopted by the district court conflicts with the intrinsic record.

The district court's construction of "generating said supplied file" largely tracks Google's surrogate proposal: "creating or tailoring a file, as distinct from selecting an existing file, *in dependence upon the received identification signal*." JA24 (emphasis added). This holding reflects three fundamental errors.

20

**First**, the district court plainly erred in concluding that its construction was required by the claim language alone. JA22 ("the language of the claims themselves is dispositive"). That is, the court noted that claim 6 depends from claim 1, and claim 1 requires "deciding which file, if any, is to be supplied *in dependence upon said determining and comparing steps*." JA22 (emphasis added); JA49. Both of the claim 1 determining and comparing steps, in turn, reference the "received identification signal"—

> determining if the request includes a *received identification signal* identifying an originating file from which said request originated; [and]
> comparing any said *received identification signal* with one or more predetermined identification signals …

JA49 (emphasis added); JA23. Based on this observation, the district court posited that "the only way a server in the '835 patent can go about creating or tailoring a file in claim 6 is by processing the 'identification signal' in claim 1." JA23. The court thus concluded in effect that, because the claim 1 decision is "in dependence upon [the] determining and comparing steps," the claim 6 customized generation must also necessarily be in dependence upon those steps—and in turn upon the received identification signal referenced in those steps. JA23.

But this conclusion is a non sequitur: just because the initial decision to supply a file depends upon a determination and comparison of identification signals does not mean that the subsequent generation of a customized file must

21

depend upon the exact same determination and comparison. JA23. Indeed, that would make little sense. And any doubt about the matter is dispelled by the specification, which makes clear that the customized generation of a supplied file is not in dependence upon any comparison of identification signals, but is instead "in dependence upon the current web page being displayed by the browser"—*i.e.*, "the originating web page" or "originating file." JA47(4:2-10); JA48(6:36-39); JA48(6:50-52); JA49(7:35); *see Phillips*, 415 F.3d at 1315-16.

The district court's conclusion also ignores the separate supplying step within claim 1's deciding step. JA49 ("if in the deciding step it is decided that a file is to be supplied, supplying said file"). The '835 patent is directed to controlling what file is served in response to a file request. JA38. Claim 1 ends with the step of supplying a file. JA49. The patent teaches that a supplied file can, for example, be a dummy file, a file matching the request, a file selected from a library of existing files, or a file customized in dependence upon the originating file. JA47-49. Independent claim 1 covers all of these situations. But in each, the supply step occurs after the steps employing identification signals to determine permitted access or authorization to receive a file. JA49. And as the specification makes clear, when the decision is made to supply a generated file, it is customized in dependence upon the originating file, not upon the comparison of identification signals. JA47-49. The district court erred in concluding otherwise. JA22-24.

**Second**, the district court plainly erred in ignoring the specification's implicit definition for the "generating" claim term, which was reflected in the construction initially proposed by both parties. JA24; JA4024-25. The law is clear that "the specification may define claim terms 'by implication'"—*i.e.*, the written description may "provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *Bell Atl. Network Servs. v. Covad Commc'ns Group*, 262 F.3d 1258, 1268 (Fed. Cir. 2001); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). And when the specification reveals such "a special definition given to a claim term … the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

The specification's repeated, consistent descriptions of the customized generation in claim 6 fall well within this line of authority.[2] Indeed, the '835 patent's notably concise written description states no fewer than four times that the customized file is created or tailored in dependence upon the originating web page file. JA47(4:5-6) ("tailored in dependence upon the current web page being

---

[2] *See also*, *e.g.*, *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1301-02 (Fed. Cir. 2004) ("terms may be redefined away from their ordinary meaning by their consistent use in the specification"); *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295, 1302 (Fed. Cir. 1999) ("the invention is described throughout the specification as it is claimed"); *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1283 (Fed. Cir. 2011) ("It is clear from the specification that the inventor so intended, and that the patent examiner so perceived the claims.").

23

displayed by the browser"); JA47(4:9-10) ("tailored to suit the originating web page"); JA48(6:37-39) ("customised in dependence upon the web page from which the request for a new web page was made"); JA48(6:51-52) ("customise the web page displayed at a browser in dependence upon the previous web page").

> The district court disagreed, concluding that there
>
> has not been an implicit 'redefinition' that is so clear as to equate an explicit redefinition. Indeed, there does not appear to have been any "redefinition," explicit or implicit, as the specification is consistent with the plain language of the claims.

JA24. This conclusion, however, conflicts with the court's own construction—which ascribes a specialized meaning, rather than the plain and ordinary meaning, to the term "generating said supplied file." JA24. Stated differently, the court's holding that this term means "tailoring a file … in dependence upon the received identification signal" confirms that—as both parties agree—the term does not carry its plain and ordinary meaning in this context, but carries instead a specialized meaning supplied by the intrinsic record. *See Bell Atl.*, 262 F.3d at 1268 ("redefining the meaning of particular claim terms away from the ordinary meaning"). There thus is no real dispute that the specification implicitly defines the "generating" term to require "tailoring … in dependence upon" something. JA22-24. The question is simply whether the implicit definition requires tailoring in

dependence upon the received identification signal or the originating file. The answer is the latter, and the court again erred in concluding otherwise. JA24.[3]

**Third**, the district court plainly erred in adopting a construction that effectively excludes the preferred embodiment that claim 6 was intended to cover. JA23-24; JA48(6:50-52); JA49. The law is again clear that a claim construction that would effectively exclude a preferred embodiment "is rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).[4]

The specification of the '835 patent describes a preferred embodiment in which the server generates a customized file that "give[s] the server an appearance of having some 'intelligence.'" JA48(6:50-52); JA47(3:14-15); JA47(3:62-4:10). In particular, the specification describes a "browser [that] requests a HTML file and generates *a web page which includes details of a company*." JA47(4:3-4)

---

[3] Google may argue, much as it did below, that the specification's implicit definition requires dependence upon "the route taken in arriving at the web page to be displayed." JA4336; JA47(3:16-17). There are at least two problems with this argument. First, the specification explains that "the route taken in arriving at the web page to be displayed" means "i.e. in dependence upon the previous web page." JA47(3:17-18). Second, this argument fails to support the district court's construction, which does not depend upon "the route taken," but instead upon "the received identification signal." JA24. Nowhere does the specification state that the supplied file is tailored to suit the received identification signal. JA46-49.

[4] *See also SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1369 (Fed. Cir. 2010); *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.").

(emphasis added). And in the customized-generation embodiment, "the details which are to be displayed can be tailored in dependence upon the current web page being displayed by the browser, *which could for instance be financial information. The HTML file then transmitted to the browser could be … specifically generated to suit the originating web page*." JA47(4:4-10) (emphasis added). The customization in this embodiment thus takes account of the "details of a company" included in a web page, and tailors the generated file with relevant "financial information" that "suit[s] the originating web page." JA47(4:2-10). This description of the preferred embodiment confirms that the tailoring at issue depends upon the web page itself, and not merely upon a URL or identification signal associated with the web page.

The district court, however, held that—under its construction of the "generating" claim term—"the only way a server in the '835 patent can go about creating or tailoring a file in claim 6 is by processing the 'identification signal' in claim 1." JA23. Because the embodiment's customization of "financial information" based on the "include[d] details of a company" is obviously different from the "identification signal" processing of claim 1, JA47-49, the court's construction of this term effectively excludes that preferred embodiment.[5]

---

[5] The district court noted that "the embodiment that specifically describes claim 6 explains that 'the server runs an application which takes in the referrer address [identification signal] and generates a new HTML file.'" JA24; JA48 (6:39-41).

The construction of "generating said supplied file," as well as the summary judgment based upon it, should thus be reversed. *Vitronics*, 90 F.3d at 1583; *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1338 (Fed. Cir. 1999).

**B.    The District Court Erred In Concluding That Gundavaram Anticipates the Asserted Claims of the '835 Patent.**

   **1.    The Gundavaram post is not a "printed publication" under Section 102.**

The district court initially erred in concluding that Gundavaram's cursory message on a Usenet newsgroup—which Google's own evidence revealed as non-indexed and non-searchable—was a "printed publication" under 35 U.S.C. § 102(a)(1). JA26-27.[6]

---

And of course the court is right on this point—the specification provides that the generating application takes the referrer address as an input. JA48 (6:39-41). This is hardly surprising: it makes perfect sense that an application designed to customize a file in dependence upon a web page would take that web page's URL as an input. This does not mean, however, that the application is tailoring the file in dependence upon that URL, rather than—as repeatedly described in the specification—in dependence upon the web page. JA47 (4:2-10).

[6] Although Suffolk did not directly raise this issue below, the district court squarely resolved it. JA26-27 (invoking the "printed publication" issue, examining it, incorrectly, under circuit precedent, and applying the statutory standard, incorrectly, to this case). It is well settled that any issues pressed *or* passed upon are properly preserved for appellate review. *Holmer v. Harari*, 681 F.3d 1351, 1356 n.3 (Fed. Cir. 2012); *WMTC, Inc. v. G.A. Braun, Inc.*, 247 F.3d 114, 116 n.2 (4th Cir. 2001). In addition, Google is the proponent of this evidence, and carries the burden on its invalidity defense. It accordingly is Google's obligation to establish (not Suffolk's initial burden to refute) that its purported prior art fits within the statutory definition of "printed publication." Google's failure to carry that burden is sufficient grounds for reversing the judgment of invalidity.

To prove anticipation, Google had to show that the invention was "described in a printed publication" before its effective filing date. 35 U.S.C. § 102(a)(1). Because this "bar is grounded on the principle" that inventions once "in the public domain" stay there, *In re Hall*, 781 F.2d 897, 898 (Fed. Cir. 1986), it is critical that the "printed publication" actually enter the public domain. That requires a showing of "'sufficient[] accessib[ility] to the public *interested in the art*,'" and not merely access, generically, to anyone. *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989) (emphasis added). "A reference is considered publicly accessible if it was 'disseminated or otherwise made available to the extent that *persons interested and ordinarily skilled in the subject matter or art* exercising reasonable diligence, can locate it.'" *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009) (emphasis added). This is determined "case-by-case," based on "facts and circumstances surrounding the reference's disclosure to members of the public." *Klopfenstein*, 380 F.3d at 1350. Unless "an interested researcher would have been sufficiently capable of finding the reference and examining its contents," the document is not a "printed publication." *Lister*, 583 F.3d at 1312.

The district court's determination, and Google's showing, fails this statutory analysis. Gundavaram allegedly posted a message in a Usenet newsgroup populated mostly by "beginners," *not* those of ordinary skill in the art. JA5132. The post was started by a self-professed "newbie" asking a possibly "ridiculous"

question. JA5118. The single thread was captured between "hundreds or thousands" of other posts, JA5133, and those posts are non-indexed and non-searchable, JA5148. (Gundavaram himself testified to leaving "hundreds" of posts on various topics in different Usenet groups. JA5130-31.) Although the threads appear by (often cryptic) titles, they are only sorted by date, JA5148—making it impossible to locate a relevant post without reviewing the entire newsgroup's database. *Lister*, 583 F.3d at 1312 (explaining that student theses "were not publicly accessible because 'they had not been either catalogued or indexed in a meaningful way.'"). The newsgroup offers none of the traditional "research tools available" for locating references. *Id.* at 1311.[7]

The district court nevertheless concluded that this message board was "publicly available." JA27. But the fact that a post is technically accessible fails even to address the pertinent question: was this the type of resource that one skilled in the art, exercising reasonable diligence, would even *try* to access in the hope of

---

[7] Gundavaram testified that chronological posting made it easy to find posts for anyone checking the newsgroup daily. JA5148. But it is not reasonable to presume that anyone who might at any point become interested in one of the thousand discussion threads is required to monitor the newsgroup each day for new items. Moreover, this Court has previously refused to deem academic theses as "printed publications" that were recorded "on individual cards which show the student's name and the title of the thesis," with each card "filed alphabetically by the author's name." *Cronyn*, 890 F.2d at 1159. This was considered insufficient as a "research aid" because the student's name "bears no relationship to the subject of the student's thesis." *Id.* at 1161. It is equally true, of course, that the date of a Usenet posting "bears no relationship to the subject" of the post.

discovering useful knowledge? There is no reason to think one skilled in the art, exercising reasonable diligence, would invest the time or effort to sort through random posts, unorganized by subject, on the off-chance that one *might* concern a relevant topic and a contributor *might* say something useful. *See*, *e.g.*, *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1379 (Fed. Cir. 2006) ("The significance of whether these theses were meaningfully catalogued or indexed was whether one skilled in the art could locate them.").

This informal Usenet discussion stands in sharp contrast to the contexts in which documents *are* deemed "printed publications." This is not an "academic paper[] filed in a university library," *Cronyn*, 890 F.2d at 1160, or a document with "widespread distribution so that the public could easily obtain copies of the publication," *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1333 (Fed. Cir. 2009); *see also*, *e.g.*, *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1351 (Fed. Cir. 2008) (finding that the "GSM bible" was a printed publication because it "sold more than 25,000 copies with the express purpose of giving wider access to the GSM standard," and because access and publicity were focused on "interested parties"). It does not involve any traditional "'repository of inventions'" (like a patent office) or an ordinary place "'where the artisan would turn for solutions for problems.'" *In re Wyer*, 655 F.2d 221, 224 (C.C.P.A. 1981). Nor does it involve an industry or academic conference specifically targeting skilled artisans to spread

knowledge. *See Klopfenstein*, 380 F.3d at 1350; *MIT v. AB Fortia*, 774 F.2d 1104, 1108-09 (Fed. Cir. 1985). This newsgroup post simply lacks any of the traditional hallmarks that define "printed publications" under Section 102.[8]

In addition, the district court's holding is fundamentally at odds with Congress' patent scheme. The point of the "printed publication" bar is to ensure that ideas vested with the public, through meaningful disclosure to individuals skilled in the arts, are not removed from the public domain. But the flipside is that documents not adequately disclosed to the relevant audience should *not* activate that statutory bar. "[T]he patent system represents a carefully crafted bargain that encourages both the creation and *the public disclosure* of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63 (1998) (emphasis added). Thus, where "prior art" does *not* secure the kind of widespread public access guaranteed by a patent, there is still a robust need for the patent monopoly. *In re Tenney*, 254 F.2d

---

[8] The district court relied on *SRI International, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186 (Fed. Cir. 2008), for the proposition that "posting an academic paper on an internet FTP server could satisfy the printed publication requirement." JA26. *SRI*, however, held that "factual issues"—even concerning a genuine *academic paper*, not an informal newsgroup posting—precluded summary judgment of invalidity, because there was insufficient evidence showing that the "paper was publicly accessible and thus a printed publication." 511 F.3d at 1195. Among other considerations, the court specifically noted that while the "paper was placed 'on' the FTP server," that server "did not contain an index or catalogue or other tools for customary and meaningful research." *Id.* at 1196.

619, 626-27 (C.C.P.A. 1958) ("what Congress was concerned with, both in 1836 and 1952, was the probability that the subject matter would be made known to the American public"); *Jockmus v. Leviton*, 28 F.2d 812, 813 (2d Cir. 1928) (Hand, J.) ("the phrase, 'printed publication,' presupposes enough currency to make the work part of the possessions of the art"); *see also Klopfenstein*, 380 F.3d at 1348 n.3. The "printed publications" bar must be carefully construed to avoid frustrating the longstanding balance struck in the patent system.

In the right circumstances, material on the Internet, even posted on non-academic and non-institutional websites, may qualify as "printed publications." *See*, *e.g.*, *Voter Verified, Inc. v. Premier Election Solutions, Inc.*, 698 F.3d 1374, 1379 (Fed. Cir. 2012) (describing an article "posted on a public website well known to those interested in the art of voting technologies" and also capable of being "retrieved from that website by searching based on subject matter"). But the evidence offered here fails to cross the threshold in a way that satisfies the underpinnings of Section 102: because this non-indexed, non-searchable post lacks the traditional indicia suggesting that this knowledge will enter the public domain, the benefits of the patent bargain remain in full effect—and expanding the "printed publications" bar to reach this context would defeat the statutory objective. *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1288 (Fed. Cir. 2011). The district court thus erred in deeming this Usenet post a qualifying "printed publication."

2.    **Serious questions undermining the reliability and accuracy of the Gundavaram post should have been submitted to the jury.**

The district court erred in holding that there were no triable issues of material fact regarding the Gundavaram post. JA25-26. To prevail on summary judgment, Google had to show that *no* rational juror could refuse to credit this putative prior art under a "clear and convincing evidence" standard. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986). But Google's evidence was hardly "so powerful that no reasonable jury would be free to disbelieve it." 11 James Wm. Moore, *Moore's Federal Practice* 1 56.40[1][c] (2011 ed.).

**First**, the Gundavaram post is not a true and correct copy of a Usenet posting from 1995. These were print-outs, from Google's own database, created for the purpose of defending Google in this litigation. They were not taken from the original Usenet newsgroup, because that newsgroup no longer exists. JA5131. In terms of preserving the document's integrity, Google could only testify that the posts were part of an aggregation of tapes and digital media that Google acquired in 2001 and has since maintained and made available to the public. JA9579. But Google never explained the specifics of how these particular documents entered Google's possession, how they were preserved, or whether their integrity was safeguarded for years before Google acquired them. JA9579 (explaining acquisition from Deja News and *unspecified* "individual donors").

Although it is true that "a proponent need not establish a perfect chain of custody or documentary evidence to support their *admissibility*," it is equally true that "'deficiencies in the chain of custody go to the weight of the evidence'"— "'once admitted, *the jury* evaluates the defects and, based on its evaluation, may accept or disregard the evidence.'" *United States v. Vidacak*, 553 F.3d 344, 350 (4th Cir. 2009) (emphases added); *see also United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985). There are serious issues regarding this chain of custody—including a multi-year gap in which no one can explain what happened to the post, how, if at all, it was protected from manipulation, or how it entered the Google database.[9] The district court may have been correct to admit this evidence under FED. R. EVID. 901(a)'s low threshold, but the court was wrong to supplant the ultimate role of the fact-finder: "The factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury." *Vidacak*, 553 F.3d at 349.

**Second**, the Gundavaram posts were reformatted and altered from their original content. Gundavaram himself confirmed that the Usenet posts were text-

---

[9] *See Novak v. Tucows, Inc.*, No. 06-CV-1909, 2007 U.S. Dist. LEXIS 21269, at *17-18 (E.D.N.Y. Mar. 26, 2007) ("it is clear that the information posted on the Wayback Machine is only as valid as the third-party donating the page decides to make it—the authorized owners and managers of the archived websites play no role in ensuring that the material posted in the Wayback machine accurately represents what was posted on their official websites at the relevant time").

only, while Google's reproduction includes images (complete with Google ads). JA5118; JA5132-33. Google did not exist in 1995. Google also admitted to manipulating the e-mail addresses in the posts. JA9580. Although its purpose may have been benign (protecting users from spambots), any alteration undermines the integrity of the reproduction as a true copy of the original. Likewise, each post in the Gundavaram chain has a 12:00 a.m. timestamp—which both sides agree is incorrect. JA5135. The fact that the timestamps were inaccurate, and the e-mail addresses were altered, could suggest to a jury that other parts of the post may also have been inaccurate or altered. Google never explains why a juror is permitted to second-guess the time of the post or its e-mail address, but not its date or contents.

**Third**, the district court is incorrect to suggest these issues are cured by the "author's" testimony. JA27. Gundavaram had no specific recollection of this post. JA5130; JA5135-36. Although he testified that he generally remembered the subject, he did not recall the post until reviewing it—*with his name on it*— supposedly 18 years later. And no one can specifically attest to drafting the document as it appears today. Gundavaram never testified, nor could he, that the Google-created document was a true and correct copy of what he might have written in 1995. And while Gundavaram purported to recognize "the style of [his] writing" and "certain stylistic things in the code," he also confirmed that these aspects of his "style" reflected a "minority" (*not* a "unique") approach to coding.

JA5131; JA5136. Falling within some unspecified "minority" is not the same thing as identifying a unique signature that truly confirms authorship.[10]

In sum, Suffolk's position is not that a juror will automatically credit Suffolk's concerns or reject Google's evidence. Suffolk's position is that its concerns about a second-hand reproduction of an old Usenet post (admittedly altered in some respects by a party to this litigation) could be credited by a rational juror—especially where Google must establish the post's accuracy and authenticity by *clear and convincing* evidence. Suffolk identified specific grounds for doubting the legitimacy of this putative prior art. It is typically the jury's role to assess the credibility of witnesses and evidence, and the district court erred in invading the province of the jury and resolving this genuine factual dispute.

### 3.    Rhyne's expert validity testimony should not have been excluded.

By departing from the controlling legal framework, the district court abused its discretion in excluding Suffolk's supplemental expert report. That report responded at the earliest opportunity to the court's claim constructions. But the court excluded the report anyway, based on a novel rationale incompatible with the

---

[10] And confirming authorship would still not confirm *date* of authorship. In his deposition, Gundavaram struggled to remember whether he graduated from college in 1995 or 1996. JA5139. His confusion, while understandable in the deposition environment, fairly suggests that other testimony relating to less significant events in his life—such as the allegedly contemporaneous Usenet posting—may be equally fuzzy. The district court discounted these legitimate reasons a jury might have questioned the reliability of Gundavaram's testimony.

Federal Rules and Fourth Circuit authority. Without this legal error, Suffolk would have "rebutted" "Google's expert opinion that the Gundavaram Post anticipates Claims 1, 7, 8, and 9 of the '835 patent," and avoided summary judgment. JA28.

1. Under FED. R. CIV. P. 37(c)(1), a party's expert report (including a supplemental report) "is not allowed" if filed outside the deadlines provided by the Rules. But that preclusion is subject to an express, textual safe harbor: "The language of Rule 37(c)(1) provides two exceptions to the general rule excluding evidence that a party seeks to offer but has failed to properly disclose: (1) when the failure to disclose is 'substantially justified,' and (2) when the nondisclosure is 'harmless.'" *Southern States*, 318 F.3d at 596 (quoting Rule 37(c)(1)). In this context, Suffolk's actions were both "substantially justified" and "harmless."

**First**, Suffolk's actions were substantially justified. Suffolk submitted its amended report squarely within the court-ordered schedule for amending reports after the *Markman* order. JA12026; JA12371. Rhyne stated in his initial report and at deposition that he might provide additional opinions after the court construed the claims. JA12427-28. Suffolk was justified in relying on the court's order.

Moreover, Rhyne's supplemental report was explicitly, and exclusively, "based on [his] review and understanding of the Court's claim constructions." JA12428. Rhyne explained how the file names in Gundavaram's post "do not identify the 'source, origin, or location' of that file." JA12458-59.

37

This logic is rooted directly in the district court's conclusion that "source, origin, or location" was a core component of an "identification signal." That determination varied from the parties' competing views (as the district court itself later acknowledged),[11] and created a new basis for distinguishing *Gundavaram* that was unavailable pre-*Markman*. This is why courts frequently permit supplementation after a *Markman* hearing produces new constructions not previously advanced by any party. *Becton Dickinson & Co. v. Syntron Bioresearch, Inc.*, No. 97-CV-1634, 1998 U.S. Dist. LEXIS 22082, at *51 (S.D. Cal. Dec. 19, 1998); *Itron, Inc. v. Benghiat*, No. 99-CV-501, 2001 U.S. Dist. LEXIS 23230, at *4-5 (D. Minn. Dec. 21, 2001).

Significantly, Google's own expert provided a supplemental report addressing the court's construction as applied to Gundavaram. JA12649-50. If the construction had been truly predictable, then Google would not have had no reason to supplement. The fact is that Suffolk offered an opinion that became available upon the court's *Markman* ruling, and that was unavailable (and unpredictable) before the court's *Markman* ruling. That is sufficient justification, particularly in light of the court's order, for the submission of the supplemental report.

---

[11] "[T]he Court's *Markman* determinations established the definition of 'identification signal' for the first time," and "Dr. Rhyne and Suffolk offer a colorable reason for concluding that the supplemental opinion is based on the Court's *Markman* definition of identification signal." JA54.

**Second**, Suffolk's actions were also harmless. Indeed, the parties agreed to supplemental reports following the *Markman* order (and thus saw no harm *ex ante*). While Google suggests it experienced unfair surprise, Google overlooks that the district court authorized (and Google took) an additional deposition of Suffolk's expert (followed by an opportunity for additional briefing) to explore Rhyne's new "infringement" theories based on the new claim constructions. JA31; JA13214. If that new *infringement* opinion (subject to new discovery and motions) failed to generate unfair surprise, there is likewise no reason that a new *invalidity* opinion (which could have been subject to new discovery and motions) would generate unfair surprise. There is no cognizable "harm" from permitting parties a first opportunity to react to a court's claim constructions in a patent case.[12]

2.  The district court did not examine the exclusion issue within the confines of the Fourth Circuit's authoritative framework. Instead, the court mentioned the applicable law and immediately ignored it, excluding the opinion based on its own

---

[12] Google's position also flunks each of the factors that the Fourth Circuit analyzes before precluding expert testimony: (1) as shown above, Google should not be (and was not) surprised by the supplemental report; (2) Google had opportunity to cure any surprise through an extra deposition and subsequent briefing; (3) the district court set a schedule permitting consideration of new motions while preserving the trial date; (4) the evidence is important, as it provides a theory on anticipation that was never before relevant in the case; and (5) Suffolk has an easy, and accepted, explanation for its failure to disclose the evidence—it did not offer the theory until the district court's ruling made the theory relevant. *Southern States*, 318 F.3d at 597; *see also Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329-30 (4th Cir. 2011).

unique legal theory. According to the district court, the "nub" of the matter was that Suffolk's failure to introduce an earlier opinion on Gundavaram and claim 1 (even one rendered moot by the court's *Markman* order) precluded introducing any subsequent opinion on the issue.    JA2552; JA2596; JA2598. As the court understood it, the supplemental report, following the *Markman* order, could not legitimately "amend" an opinion because there was no opinion to amend. It thus concluded that any opinion on claim 1 and Gundavaram—despite turning directly on the court's new claim constructions, which did not previously exist—was untimely and improper.

The district court's theory is wrong and unworkable. There is no reason to punish a party for failing to offer an opinion on a claim construction *that does not yet exist*. Parties are not responsible for predicting how a court might reject each side's proposals and adopt a unique view of the patent-in-suit. Nor is there any obvious reason to limit the scope of supplemental opinions to a party's past efforts to issue a *now-defunct* opinion. It would be one thing if a party used the court's claim construction as an excuse for introducing a theory that was fully viable earlier in the case; but it is another thing entirely to say a party is limited by its past opinions when those past opinions are no longer relevant (and the present opinion is relevant, for the very first time, based on court-generated developments).

Neither the court nor Google has cited any principled basis for asking experts to conjure up hypothetical opinions, based on hypothetical claim constructions that neither party advanced—all to preserve the right to opine on critically important issues should the court change the landscape with its *Markman* ruling. This approach is found nowhere in Rule 37's dictates or the Fourth Circuit's framework limiting the bounds of a district court's discretion. Because the court's entire basis for granting summary judgment of invalidity was its incorrect exclusion of Suffolk's opinion—thus leaving Google's efforts supposedly "unrebutted"—the judgment below should be reversed.[13]

### 4.    Even without Rhyne's testimony, summary judgment of invalidity should not have been granted.

Even without Rhyne's supplemental expert report, the district court still erred in holding that Google proved anticipation under Rule 56. "Anticipation is a question of fact" subject to proof by clear and convincing evidence. *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1335 (Fed. Cir. 2009). It is not enough

---

[13] The Fourth Circuit's analysis implicates a circuit split concerning whether Rule 37 requires a showing of "bad faith." *Compare Southern States*, 318 F.3d at 598 (refusing to require bad faith and acknowledging the conflict), *with Keach v. U.S. Trust Co.*, 419 F.3d 626, 640 (7th Cir. 2005) (including "bad faith" as a factor); *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000) (same). Given the lack of bad faith, Suffolk would also prevail under the law in these other circuits, and Suffolk accordingly preserves this issue for further review, if necessary.

for Google to exclude Rhyne's report; unless *Google's affirmative theories* are accepted by a jury, its anticipation defense fails.

As explained, the district court's *Markman* order altered the legal landscape: A signal *identifying a file* (Suffolk's proposed construction) is not the same as a signal *identifying the source, origin, or location of a file* (the district court's construction). The file name found at the end of a URL, for example, would not in itself satisfy the court's construction of an identification signal. Information that identifies the source, origin, or location of a file requires both the particular file name at the end of the URL and the server and directory information for that file disclosed in other portions of the URL. Rhyne's supplemental opinion on validity, post-*Markman*, is that the Gundavaram reference disclosed identifying information for a file alone, *without any reference to a particular server or directory*, and as such would not meet the district court's construction for "identification signal." *See also* JA12434-35.

Therefore, under the court's new construction, even if Gundavaram is prior art, that reference was not anticipatory to independent claim 1, since the exemplary files disclosed in that reference were not in the context of a URL and did not provide additional information (beyond "abc.html") communicating source, origin or location. At the hearing on Google's summary-judgment motion for invalidity,

42

which followed the *Markman* rulings, Suffolk's counsel explained to the district court how, in light of the court's construction, Gundavaram did not anticipate:

> An address would be, under your new construction of "identification signal," an identification signal because it would be a location. The so-called Gundavaram reference does not take a referrer address and compare it to an address. It compares it to a file. If you look at that so-called Gundavaram address, the comparison is of a referrer address to—they give two instances of comparison: ABC.HTML and EFG.HTML. Those are files. Those are not addresses. This is no longer [an] anticipatory reference.

JA2361-62; *see also* JA2357.

With or without Rhyne, Suffolk can still attack Google's *affirmative* case (on cross-examination or otherwise) on this basis by showing how Google's own experts cannot find in Gundavaram the additional features required by the court's construction. "It is axiomatic that for anticipation, *each and every* claim limitation must be explicitly or inherently disclosed in the prior art." *In re NTP, Inc.*, 654 F.3d 1279, 1302 (Fed. Cir. 2011); *Kyocera*, 545 F.3d at 1351. Because Google's efforts are undermined by this rule—and because Suffolk made perfectly clear that it did indeed contest Google's showing on this score, JA2361-62—the district court was simply incorrect in concluding that Google established anticipation by "substantial and unrebutted record evidence." The district court's holding neglects Google's burden of proof, overlooks the appropriate role of cross-examination, fails to draw all reasonable inferences in Suffolk's favor, and ultimately supplants the jury's role as the arbiter of this fact-based statutory defense. The summary

judgment of invalidity should be reversed. *See Osram Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 705-06 (Fed. Cir. 2012) (reversing summary judgment of invalidity that resolved factual disputes).

## C.     The District Court Erred in Excluding the Testimony of Suffolk's Damages Expert.

Where "scientific, technical or otherwise specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue," an expert witness may testify "if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-89 (1993). When the methodology is sound, and the

> evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight but not its admissibility.

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed Cir. 2010). In the context of expert damages testimony, questions "about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury." *Id.* at 856. Because Weinstein's methodology was sound—as Google's expert agreed, JA9638-39—any questions about the accuracy of his results should be resolved by the jury.

Weinstein's approach to calculating damages involved two fundamental steps. JA9807-10.

The **first step** was to measure, in conjunction with an analysis under the *Georgia-Pacific* factors, the incremental profits attributable solely to Google's use of the patented technology. JA9781-809; JA10075; JA10009-10; *see also* JA9638. Weinstein thus took the revenue and profit figures associated with the accused product and made three separate apportionments, excluding: 1) any profits attributable to noninfringing functionality; 2) any profits attributable to Google's relative contribution to the infringing functionality; and 3) any profits that Google might have earned using the next best alternative in place of the patented technology. JA9807-09; JA10075; JA10009-10. The remaining figures represented the incremental profits attributable solely to the patented technology—that is, the profits embedded within the invention's footprint in the marketplace. JA10075.

The **second step** was to determine how the parties would have agreed to share these patent-specific incremental profits in their hypothetical negotiation. JA9808-09; *see also* JA9638. Weinstein offered two possibilities: 1) an application of the "Nash Bargaining Solution" that led to an even split of these incremental profits, and 2) an alternative analysis that reflected profit splits Google had accepted in previous marketing agreements. JA9809-10.

While Google's damages expert disagreed with certain "assumptions and calculations that Weinstein employed in implementing [this] framework," she

conceded that his fundamental two-step methodology was conceptually sound and tracked her own approach to calculating damages in this case. JA9638-39.

The district court characterized Weinstein's two-step methodology as,

in essence, (i) the application of the *Georgia-Pacific* factors, followed by (ii) the application of a 50/50 split, derived from the NBS.

JA34. And while there was no dispute that the *Georgia-Pacific* factors have long been approved for estimating a reasonable royalty, *see i4i*, 598 F.3d at 854, the district court excluded Weinstein's testimony regarding both steps on the grounds that: 1) use of the NBS in the second step was "indistinguishable from the 25% rule of thumb" rejected in *Uniloc*; and 2) that alleged second-step infirmity also rendered inadmissible—under *Uniloc*—the otherwise appropriate *Georgia-Pacific* analysis in the first step. JA34-36. The district court erred on both points.

### 1. Weinstein's determination of the invention's footprint in the marketplace is consistent with *Uniloc*.

Although the district court's analysis ultimately turned on an erroneous treatment of the NBS, the court's first error was excluding Weinstein's testimony regarding the *Georgia-Pacific* factors. JA34-36. This exclusion was based on the district court's observation that, after rejecting the 25% rule of thumb in *Uniloc*, this Court further held that

[i]t is of no moment that the 25 percent rule of thumb is offered merely as a starting point to which the *Georgia-Pacific* factors are then applied to bring the rate up or down. Beginning from a fundamentally flawed premise and adjusting it based on legitimate

46

considerations specific to the facts of the case nevertheless results in a
fundamentally flawed conclusion.

*Uniloc*, 632 F.3d at 1317; JA34. The district court erroneously assumed that
"[b]eginning from a fundamentally flawed premise" was "not meaningfully
distinguishable" from beginning with "legitimate considerations specific to the
facts of the case." JA34-35. That is, the court acknowledged that—in contrast to
the expert in *Uniloc*—Weinstein first "applied the *Georgia-Pacific* factors to the
revenue stream associated with the putative infringing product." JA34. But the
court read *Uniloc* to hold that an infirmity at any subsequent step necessarily
renders unreliable any initial steps of a reasonable-royalty calculation. JA34-35.

That is not what *Uniloc* holds. Indeed, in the paragraph following the one
cited by the district court, *Uniloc* provides that expert testimony is admissible
when it "carefully tie[s] proof of damages to the claimed invention's footprint in
the marketplace," and further that the Court "has sanctioned the use of the
*Georgia-Pacific* factors to frame [that] inquiry." *Uniloc*, 632 F.3d at 1317. This
was precisely Weinstein's approach—he began with a *Georgia-Pacific* analysis
that carefully outlined the incremental profits attributable to the invention's
footprint in the marketplace. JA9781-809; JA10075. This properly "frame[d] the
reasonable royalty inquiry." *Uniloc*, 632 F.3d at 1317. The holding that
"[b]eginning from a fundamentally flawed premise … results in a fundamentally
flawed conclusion" simply reflects the common-sense truth that starting with an

arbitrary shoe size is not a reliable means of finding a specific footprint. *See id.* Weinstein reasonably—and reliably—began his analysis by finding that specific footprint in the marketplace. *See id.*; JA9781-809; JA10075; *see also* JA9638. That testimony should not have been excluded. JA13499-505.

Furthermore, after finding this specific footprint, Weinstein offered two ways to split the carefully calculated incremental profits among the parties—only one of which involved an application of the NBS. JA9809-10. The district court never addressed the second option, which reflected profit splits that Google had accepted in the past. JA32-36; JA9810. That testimony likewise should not have been excluded. JA32-36. This Court can therefore reverse the district court's exclusion of Weinstein's testimony even without reaching the propriety of using the NBS. *See*, *e.g.*, *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1268 (Fed. Cir. 2008) (approving expert testimony on a subset of proposed topics).

### 2. Weinstein's application of the NBS to the invention's footprint in the marketplace is consistent with *Uniloc*.

While this Court can reverse the district court's holding without reaching the propriety of Weinstein's second-step NBS application, Suffolk respectfully urges the Court to confirm—for the litigants in this case and those in future cases—that the district court plainly erred in finding that the NBS "is indistinguishable from the 25% rule of thumb" that was rejected in *Uniloc*. JA36. In fact, the NBS is fundamentally different from the 25% rule of thumb, and suffers from none of the

infirmities of that arbitrary rule. *Uniloc*, 632 F.3d at 1313-14. The district court's contrary holding should be reversed for at least three reasons: the NBS is good science; it is tied to the facts of the case; and Weinstein reliably applied the NBS to the specific facts of this case. *See* FED. R. EVID. 702.

**First**, Rule 702's *Daubert* analysis is fundamentally concerned with distinguishing "good science" from "bad science." *See Daubert*, 509 U.S. at 593. The 25% rule of thumb was bad science, if science at all—it was, as the Court recognized, an "essentially arbitrary" rule that did not fit within any rigorous "model of the hypothetical negotiation." *Uniloc*, 632 F.3d at 1313-14. The NBS— also referred to as "game theory" analysis—stands in stark contrast: it is universally acknowledged as good science, and represents the standard economic model for calculating negotiation outcomes. JA9772-79.

Any doubt on this point was dispelled by the Nobel prize committee. In awarding John Nash the 1994 prize in economic sciences, the committee acknowledged that "game theory has become a dominant tool for analyzing economic issues," and that Nash's "basic solution for cooperative games, usually referred to Nash's bargaining solution," has "been applied extensively in different

branches of economic theory."[14] The law is clear that Rule 702 requires less than "general acceptance" of a methodology within the scientific community. *Daubert*, 509 U.S. at 588-89. But general acceptance certainly suffices, *see id.*, and such acceptance is amply demonstrated by the Nobel committee's decision to award Nash the prize in economics for his work on this subject. JA9773-74.

The NBS's status as good science in the context of reasonable royalty negotiations is further confirmed by both the academy and the courts. In the years since Nash was awarded the Nobel prize, a substantial body of academic literature has been devoted to discussing, analyzing, and advocating application of the NBS or game theory in this context. JA9777-78. This literature explains why the NBS represents "a more reasonable approach than starting with an admittedly arbitrary [25%] benchmark," Jonathan D. Putnam, *Bargaining and the Construction of Economically Consistent Hypothetical License Negotiations*, THE LICENSING JOURNAL 14 (2004), and how the NBS can assist courts in "determining an equitable reasonable royalty using the hypothetical negotiation model." RICHARD F. CAULEY, WINNING THE PATENT DAMAGES CASE 26-31 (2d ed. 2011). Noted professor Mark Lemley has also advocated using "the standard economic theory of

---

[14] *See* http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/1994/press.html. This extensive application of the NBS in diverse economic fields is reflected in dozens of academic articles published in refereed journals and textbooks, a number of which are cited in Weinstein's expert report. JA9772-74.

Nash bargaining" to arrive at a proper benchmark royalty rate. Mark A. Lemley &

Carl Shapiro, *Frontiers of Intellectual Property: Patent Holdup and Royalty*

*Stacking*, 85 TEXAS LAW REVIEW 1991, 1996-99 (2007).[15]

Until now, the courts have agreed. *See*, *e.g.*, *Amakua Dev. LLC v. Warner*,

No. 05-CV-3082, 2007 U.S. Dist. LEXIS 49952, at *64 (N.D. Ill. July 10, 2007)

(admitting testimony "based on bargaining theory consistent with a 'Nash

Equilibrium' outcome among parties with equal bargaining power, so called for

Nobel-prize-winning economist John Nash"); *Minebea Co. v. Papst*, No. 97-CV-

590, 2005 U.S. Dist. LEXIS 11946, at *15 (D.D.C. June 21, 2005) (noting that the

court had "no doubt about [the expert's] methodology" in applying "the well-

---

[15] *See also*, *e.g.*, John C. Jarosz & Michael J. Chapman, *Application of Game Theory to Intellectual Property Royalty Negotiations, in* LICENSING BEST PRACTICES 241-65 (Robert Goldscheider and Alan H. Gordon, eds. 2006); William Choi & Roy Weinstein, *An Analytical Solution to Reasonable Royalty Rate Calculations*, THE JOURNAL OF LAW AND TECHNOLOGY, Vol. 41, No. 1 (2001); Elizabeth M. Bailey, Gregory K. Leonard, Mario A. Lopez, *Making Sense of 'Apportionment' in Patent Damages*, THE COLUMBIA SCIENCE AND TECHNOLOGY LAW REVIEW, Vol. 12 (2011); A. Frank Adams, III, Peter T. Calcagno, and Budina Naydenova, *Patent Royalty Rates: A Look at Recent Court Decisions* (2008); Chester C. McGuire, *Simulation Modeling in Forensic Economics: The Example of Reasonable Royalty Negotiations*, LITIGATION ECONOMICS DIGEST (1999); T. Paul Tanpitukpongse and Kanav Hasija, *Game Theory: A Zooming and Sliding Method for the Determination of Reasonable Royalties in Patent Damages*, THE INAUGURAL SAMSUNG-STANFORD CONFERENCE ON PATENT REMEDIES (2011); William Choi and David Stein, *Economic Gains from Licensing as an Estimate of the Reasonable Royalty*, AMERICAN BAR ASSOCIATION, SECTION OF INTELLECTUAL PROPERTY LAW, 27TH ANNUAL INTELLECTUAL PROPERTY LAW CONFERENCE (2011) ("[T]he NBS continues to be widely cited in peer-reviewed studies in economics and specifically has been applied to the study of patent licensing.").

known Nash equilibrium concept"); *Grand River Enters. Six Nations v. King*, No. 02-CV-5068, 2011 U.S. Dist. LEXIS 27424, at *22 (S.D.N.Y. Mar. 17, 2011) (noting that "game theory analysis" is a "textbook methodolog[y] which [is] generally accepted and widely used by economists to predict prices in various contexts").[16] Significantly, this appears to be the first case in which a court has excluded NBS testimony as reflecting bad science under Rule 702.[17]

**Second**, the NBS is necessarily tied to the facts of the case. This again stands in stark contrast to the 25% rule of thumb. That rule simply assumed that the infringer would agree to pay the patentee a 25% royalty on its profits associated with the infringing product. *Uniloc*, 632 F.3d at 1312. Thus, if an infringer sold a product that incorporated the patented technology for $10 and

---

[16] *See also*, *e.g.*, *VirnetX Inc. v. Apple Inc.*, No. 6:10-CV-417, 2013 U.S. Dist. LEXIS 35631, at *51-54 (E.D. Tex. Feb. 26, 2013) (admitting NBS testimony over objection); *Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms., Inc., USA*, No. 07-CV-6855, 2011 U.S. Dist. LEXIS 10512, at *35-37 (D.N.J. Feb. 3, 2011) (not designated for publication) (rejecting argument that the NBS is "akin to the 25 percent rule rejected in *Uniloc*").

[17] One district court excluded testimony relating to the NBS under Rule 403. *Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 1111, 1119-21 (N.D. Cal. 2011). The court did not find that the NBS involved *bad* science, but instead that it involved *too much* science: "[t]he Nash bargaining solution involves complex mathematical formulas and equations that would surely be incomprehensible to the average juror." *Id.* at *25. But the court misapprehended the NBS, *see id.* at *24, and in any event the presence of mathematical formulas is a reason to permit, not to exclude, expert testimony that will assist the trier of fact to understand that evidence. *See* Fed. R. Evid. 702. And even in *Oracle*, the court did not extend its exclusion of NBS-related testimony to cover the expert's proposed testimony related to the *Georgia-Pacific* factors. *Oracle*, 798 F. Supp. 2d at 1120-21.

made a $4 profit, under the 25% rule the infringer would be assumed to pay the patentee $1 (a 25% royalty applied to its $4 profit). That "essentially arbitrary" rule thus failed to consider the "relationship between the patent and the accused product"—it took "no account of the importance of the patent to the profits of the product sold." *Id.* at 1313. It also failed to consider the "relationship between the parties," and was effectively unmoored from the facts of the case. *Id.* at 1313-15.

Where the 25% rule of thumb was arbitrary and unmoored, the NBS is rigorous and well-grounded. At a basic level, the NBS assigns to each party in a bilateral negotiation the profit the party would obtain from not reaching an agreement, and splits the remaining agreement surplus profits according to the parties' relative bargaining power. JA9772-75. Critically, using the prior example of an infringer selling a product incorporating the patented technology for $10 with a $4 profit, the NBS confines itself to the value created by including the patented technology in the product. For example, assume an infringer sold a product where the patented technology resulted in an incremental $4 profit—but without the patented technology, the infringer could sell a similar product and make a $3 profit. Under the 25% rule, the infringer would pay the patentee $1 (a 25% royalty on its $4 profit) regardless of an infringer's noninfringing alternatives. Under the NBS, the infringer would pay the patentee (assuming equal bargaining power) $0.50 based on an equal split of the $1 incremental benefit over the next best

53

alternative. If, on the other hand, the infringer could sell a similar product and make a profit of $3.98, the infringer would now pay the patentee only $.01 under the NBS, while the 25% rule would continue to dictate a payment of $1.00. In the NBS, the parties thus bargain not over the infringer's total profits, but over the incremental value conferred by the patented technology over the next best alternative. JA9772-75; JA10075. The NBS is therefore fundamentally different from the 25% rule, and "carefully tie[s] proof of damages to the claimed invention's footprint in the market place." *Uniloc*, 632 F.3d at 1317.

It is noteworthy that, in support of its rejection of the 25% rule of thumb, *Uniloc* cited an article by Richard Toikka explaining that the rule fails to "distinguish between monopoly and normal profit …. Thus for narrow patents, the rule may be overly generous to the patentee, and for broad patents it may be overly stingy." *Uniloc*, 632 F.3d at 1313. In that article—in the very paragraph cited by the Court, in fact—Toikka further explains that, "if licensor and licensee have equal bargaining strength, the [proper analysis] leads to the monopoly profit being equally divided between licensor and licensee." Richard Toikka, *Patent Licensing Under Competitive and Non-Competitive Conditions*, 82 J. PAT. & TRADEMARK OFF. SOC'Y 279, 293 (2000). And "monopoly profit," like the profit at issue in the NBS, is "the return attributed to the patent." *Id.* In rejecting the 25% rule of thumb,

therefore, this Court pointed to literature highlighting that arbitrary rule's shortcomings in light of widely accepted NBS-related methodology.

**Third**, Weinstein reliably applied the NBS to the specific facts of this case. As discussed above, the precondition to any application of the NBS is finding the agreement surplus—here, the incremental profits reflecting the value of the invention over Google's next best alternative. Weinstein accomplished this with his first-step *Georgia-Pacific* analysis. JA9781-809; JA10075. There is no real dispute that this analysis was methodologically sound and tied to the facts of the case. Once the agreement surplus has been identified, the NBS holds that parties of equal bargaining power will rationally agree to split it evenly. JA9774-75. But this step still requires analysis of the relationship between the parties at the time of the hypothetical negotiation, JA9775—and Weinstein engaged in that analysis.

As he explained, he considered the relative size and power of the parties: at the time of the negotiation, Google was a newcomer and BT an established giant. JA10085.[18] He also considered the relative importance of the technology to the parties: it was far more important to Google than to BT. JA10085. His analysis also accounted for the fact that BT and Google did not make competing products. JA10085-86. After considering these factors, Weinstein concluded that the parties

---

[18] As the owner of the '835 patent at the time of the hypothetical negotiation, BT would have been a participant in the negotiation with Google.

had generally equal bargaining power, and thus no adjustment from an even split of the agreement surplus was necessary. JA10082-86; JA9389.

While Google is certainly free to disagree with this conclusion, and to test it on cross-examination at trial, the district court plainly erred in concluding that Weinstein's application of the NBS was "not tied to the facts of this case and … essentially no different from the 25% rule of thumb rejected in *Uniloc*." JA35. The court's exclusion of Weinstein's testimony under Rule 702 should be reversed.

## VIII.  CONCLUSION AND RELIEF REQUESTED

For these reasons, this Court should reject the district court's construction of the term "generating said supplied file," adopt Suffolk's competing construction, and reverse the final judgment of invalidity; reverse the summary and final judgments of invalidity for any of four additional and *independent* reasons—the incorrect determination of "printed publication," the improper conclusion that Gundavaram is "clear and convincing" proof of prior art, the improper exclusion of Rhyne's expert report, and the incorrect finding that Google's anticipation defense was "unrebutted"; reverse the improper exclusion of Weinstein's expert testimony; and remand this case for further proceedings.

Date: July 29, 2013                    Respectfully submitted,

/s/ Joel L. Thollander
Joel L. Thollander
McKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, Texas  78701
(512) 692-8700

Roderick G. Dorman
*Principal Attorney*
McKOOL SMITH HENNIGAN, P.C.
865 Figueroa, Suite 2900
Los Angeles, CA 90017
(213) 694-1200

Douglas A. Cawley
Daniel L. Geyser
McKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4000

*Attorneys for Plaintiff-Appellant*
*Suffolk Technologies, LLC*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

Suffolk Technologies, LLC,           )
                                     )
    Plaintiff,               )
                                     )
v.                                   )     Civil Action No. 1:12cv625-TSE-IDD
                                     )
AOL Inc., et al.,                    )
                                     )
    Defendants.              )

FILED

APR 1 8 2013

CLERK, U S DISTRICT COURT
ALEXANDRIA, VIRGINIA

## <u>JUDGMENT</u>

Pursuant to the order of this Court entered on April 18th, 2013 and in accordance with

Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the defendant

Google, Inc.

FERNANDO GALINDO, CLERK OF COURT

By:_____
            Deputy Clerk

Dated: April 18th, 2013
Alexandria, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUFFOLK TECHNOLOGIES LLC,          )
    Plaintiff,                     )
                                   )
        v.                         )        Case No. 1:12cv625
                                   )
AOL INC. AND GOOGLE INC.,          )
    Defendants.                    )

**FINAL JUDGMENT**

The matter is before the Court pursuant to the parties' Stipulation and Joint Request for Entry of Judgment of Invalidity.

The record reflects that by Order dated April 16, 2013 the Court ruled that Claims 1, 7, 8, and 9 of the '835 Patent were invalid as anticipated by the Gundavaram Post. *See Suffolk Techs. LLC v. Google Inc.*, No. 1:12cv625 (E.D. Va. Apr. 16, 2013) (Order) (doc. 548). Plaintiff's claims for infringement and willful infringement of patent claims 2 and 5 have been dismissed by agreement of the parties. *See Suffolk Techs. LLC v. Google Inc.*, No. 1:12cv625 (E.D. Va. Apr. 17, 2013) (Order). With respect to Claim 6 of the '835 Patent, the parties have stipulated in their Stipulation and Joint Request for Entry of Judgment of Invalidity that this Claim is invalid on the grounds that it was anticipated by the Gundavaram Post. Thus, all of the '835 Patent claims in issue in plaintiff's complaint for infringement and willful infringement have been disposed of and the entry of final judgment pursuant to Rule 58, Fed. R. Civ. P., is now appropriate.

Accordingly, and for good cause,

It is hereby **ORDERED, ADJUDGED, and DECREED** that this matter is **DISMISSED** with prejudice and the Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of defendant Google Inc.

It is further **ORDERED** that each party is to bear its own fees and costs, including attorney's fees, in connection with this action. Plaintiff shall take nothing from its claims against defendant on any allegations which it made or could have made in this matter.

It is further **ORDERED** that the following motions are **DENIED AS MOOT**, as it is unnecessary to reach or decide these motions: [1]

    (i)    Plaintiff's motion for partial summary judgment (doc. 271);

    (ii)    Plaintiff's motion to strike certain evidence proffered by defendant (doc. 337);

    (iii)    Plaintiff's motions *in limine* #1, #3, #8, #9, #10, and #11 (docs. 437, 439, 445, 447, 449, and 451);

    (iv)    Defendant's motions *in limine* regarding liability issues and regarding damages and financial issues (docs. 461 and 462); and,

    (v)    Plaintiff's motion for reconsideration to conform relief to the reasoning of the Court's *Daubert* Order (doc. 539).

The Clerk is directed to send a copy of this Order to all counsel of record and to place this among the ended causes.

Alexandria, VA
April 18, 2013

/s/

T. S. Ellis, III
United States District Judge

---

[1] The pending motions relating to sealing of documents will be addressed in a separate order.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

SUFFOLK TECHNOLOGIES, LLC,

           Plaintiff,

        v.

AOL INC. and GOOGLE INC.,

           Defendants.

Civil Action No. 1:12-cv-625-TSE-IDD

**STIPULATION AND JOINT REQUEST FOR ENTRY
OF JUDGMENT OF INVALIDITY**

EXHIBIT A
**JA00004**

Plaintiff Suffolk Technologies, LLC and Defendant Google Inc. state as follows:

WHEREAS, by its filing dated April 5, 2013 (Dkt. 477), Suffolk indicated its intention to narrow its case and assert at trial only claims 1, 6, 7, and 9 of United States Patent No. 6,081,835 (the '835 patent);

WHEREAS this Court during a telephonic conference call on Friday, April 12, 2013 notified all counsel that it intended to issue an order granting partial summary judgment of invalidity on claims 1, 7, and 9, based on Google's motion that the Gundavaram reference is prior art to the '835 patent and that claims 1, 7, and 9 of the '835 patent are invalid as anticipated by the Gundavaram reference, and notified counsel that it intended to issue an order denying Suffolk's pending motion for partial summary judgment on Google's affirmative defenses;

WHEREAS Suffolk objected to and opposed Google's motion for summary judgment, and intends to preserve all objections and opposition for appeal;

WHEREAS the Court issued an order construing disputed claim terms (Dkt. 345);

WHEREAS each party wishes to preserve for appeal all challenges, if any, that respective party may have to some or all of the Court's claim constructions;

WHEREAS, by way of the Court's Orders dated March 22, 2013 and April 12, 2013 (Dkt. 422 & 530), the Court struck certain testimony of Dr. V. Thomas Rhyne, III over the objection of Suffolk, which objections Suffolk intends to preserve for appeal, and the Court also allowed certain testimony of Dr. V. Thomas Rhyne, III over the objection of Google, which objections Google intends to preserve for appeal;

WHEREAS, by way of the Court's Order dated April 12, 2013 (Dkt. 518), the Court granted Google's motion to exclude the testimony of Suffolk's damage expert, Roy Weinstein

EXHIBIT A
**JA00005**

(DKT. 267) in its entirety, over the objection of Suffolk, which objections Suffolk intends to preserve for appeal; and

WHEREAS, in light of the Court's rulings in this matter and both parties expressly preserving all objections and opposition for appeal, Suffolk stipulates that under the Court's rulings the Gundavaram reference anticipates claim 6 because the Court has determined by partial summary judgment that independent claim 1 from which claim 6 depends is invalid based on the Gundavaram reference and, in addition, the Gundavaram reference discloses creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal at least because the print statement in the elseif computer code is created or tailored in dependence upon the environment variable HTTP_REFERER, which qualifies as the "received identification signal" under the Court's claim construction ruling ("digital information that identifies the source, origin, or location of a file"); and

WHEREAS subject to the reservations above, Suffolk agrees to allow dismissal with prejudice to be granted on all other asserted claims of the '835 patent as alleged in the First Amended Complaint (Doc. 52);

Suffolk and Google, by their undersigned counsel, hereby stipulate and agree, subject to the approval of the Court, as follows:

1.      That, in light of the Court's prior rulings, the Court enter judgment of invalidity of claim 6 based on anticipation by the Gundavaram reference, subject to the reservations by each party of any and all objections and appeal rights that respective party may have on any issue reviewable by the Federal Circuit, including without limitation questions of claim construction, invalidity, summary judgment burden of proof, the exclusion of expert testimony, and the admissibility of evidence;

2

EXHIBIT A

2.      That, upon issuance by the Court of its order granting summary judgment of invalidity on asserted claims 1, 7, and 9 of the '835 patent, having resolved all remaining issues, the Court shall enter final judgment for Defendant and against Plaintiff in the form shown in the attached Exhibit A; and

3.      That each party shall bear its own fees and costs, including attorneys' fees, in connection with this action.

**SO STIPULATED this 16th day of April 2013:**

/s/ Craig C. Reilly
Craig C. Reilly VSB # 20942
111 Oronoco Street
Alexandria, Virginia 22314
TEL: (703) 549-5354
FAX: (703) 549-2604
E-MAIL: craig.reilly@ccreillylaw.com
*Counsel for Plaintiff*

/s/ Stephen E. Noona
Stephen E. Noona VSB # 25367
Kaufman & Canoles, P.C.
150 W. Main Street, Suite 2100
Norfolk, VA 23510
TEL: (757) 624-3239
FAX: (757) 624-3169
E-MAIL: senoona@kaufcan.com
*Counsel for Defendant*

Roderick G. Dorman, *Pro Hac Vice*
Jeanne Irving, *Pro Hac Vice*
Alan P. Block, *Pro Hac Vice*
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa Street, Suite 2900
Los Angeles, CA 90017
Telephone:  (213) 694-1200
Facsimile:  (213) 694-1234
Email: rdorman@mckoolsmithhennigan.com
jirving@mckoolsmithhennigan.com
ablock@mckoolsmithhennigan.com
*Counsel for Plaintiff*

Robert Van Nest (*pro hac vice*)
Christa M. Anderson (*pro hac vice*)
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 9411
GoogleServiceList-Suffolk@kvn.com
*Counsel for Defendant*

3

**EXHIBIT A**
**JA00007**

Doug Cawley, *Pro Hac Vice*
MCKOOL SMITH P.C.
300 Crescent Court
Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044
Email: dcawley@mckoolsmith.com
Email: acurry@mckoolsmith.com
*Counsel for Plaintiff*

David A. Perlson (*pro hac vice*)
David L. Busker (*pro hac vice*)
Antonio R. Sistos (*pro hac vice*)
Margaret P. Kammerud (*pro hac vice*)
Rebecca A. Bers (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
davidperlson@quinnemanuel.com
davidbilsker@qumnemanuel.com
antoniosistos@quinnemanuel.com
megkammerud@quinnemanueLcom
rebeccabers@quinnemanuel.com
*Counsel for Defendant*

4

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E D

FEB 2 5 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

SUFFOLK TECHNOLOGIES LLC,  )
    Plaintiff,  )
        )
    v.  )    Case No. 1:12cv625
        )
AOL INC. AND GOOGLE INC.  )
    Defendants.  )

## ORDER

The matter came before the Court for a *Markman*[1] hearing. The parties fully briefed and presented extensive oral argument on the parties' proposed constructions of disputed claims. In addition, the parties submitted supplemental memoranda addressing when it is appropriate for a court to infer that a patentee has acted as his own lexicographer.

For reasons to be set forth in a forthcoming memorandum opinion, and for good cause,

It is hereby **ORDERED** that the disputed claim terms are constructed as follows:

(i)   "**file**" – a collection of information that is treated as a unit and stored on, or created by, a server.

(ii)   "**identification signal**" – digital information that identifies the source, origin, or location of a file.

(iii)   "**generating said supplied file**" – creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
February 25, 2013

            /s/
             T. S. Ellis, III
             United States District Judge

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
APR 18 2013
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

SUFFOLK TECHNOLOGIES LLC,      )
    Plaintiff,      )
          )
    v.      )    Case No. 1:12cv625
          )
AOL INC. AND GOOGLE INC.,      )
    Defendants.      )

## MEMORANDUM OPINION

In this patent infringement case, Suffolk Technologies LLC ("Suffolk"), the sole owner of U.S. Patent No. 6,081,835 ("the '835 patent"), sues defendant Google, Inc. ("Google")[1] for infringement and willful infringement of the '835 patent, which purports to cover several methods for controlling a server in response to requests for files from web pages. As is typical in a patent infringement suit, the parties dispute the meaning of several material claim terms and phrases, necessitating *Markman*[2] claim construction determinations.

On February 25, 2013, an Order issued setting forth the claim construction determinations.[3] This memorandum opinion sets forth the reasoning in support of the claim construction determinations.

---

[1] By Order dated January 30, 2013, the parties, pursuant to Rule 41, Fed.R.Civ.P., stipulated to the dismissal with prejudice of all claims asserted by Suffolk against defendant AOL Inc., and to all counterclaims by AOL Inc. against Suffolk. *See Suffolk Techs. v. AOL, Inc.*, No. 1:12cv625 (E.D. Va. Jan. 30, 2013) (Order).

[2] In *Markman v. Westview Instruments, Inc.*, the Supreme Court held that "the construction of a patent, including terms of art within its claim, is exclusively the province of the court." 517 U.S. 370, 372 (1996).

[3] *See Suffolk Technologies LLC v. AOL, Inc.*, No. 1:12cv625 (E.D. Va. Feb. 25, 2013) (Order).

– 1 –

## I.

The genesis of the '835 patent is not in dispute. In September 1995, British Telecommunications, plc ("BT") learned that a webpage that disparaged BT was using a BT logo obtained from a BT server. It appears that the operator of the disparaging webpage was able to obtain the BT logo from the BT server simply by directing internet browsers accessing the disparaging website to obtain the BT logo from the BT server and then to display the BT logo as part of the disparaging webpage on the user's computer screen. The BT server was not capable of controlling access to the BT logo based on the source of the request for the BT logo and the disparaging webpage took advantage of this weakness.

To remedy this situation, the inventors, BT employees, devised the method that is claimed in the '835 patent. In essence, the '835 patent teaches a method for operating a file server that entails using information about a requesting webpage to decide whether the server should send the requested file to the requesting webpage. The first step in the method begins with a file, such as an HTML file for a webpage, requesting a file from a server. The method goes on to provide that the server looks at the identification signal of the requesting file, compares this received identification signal with a set of predetermined identification signals, and then decides whether or not to fulfill the request for a file. In addition to sending the requested file, the second server may also, based on the received identification signal, (i) send a 'dummy' file in place of the requested file or (ii) send a newly generated file—that is a file newly created, or an existing file that is tailored, based on the identification signal. Thus, the '835 patent solved BT's problem, as the BT server would be able to determine whether the request for the BT logo originated from a non-approved webpage and could either refuse to provide the BT logo or provide a dummy file instead.

– 2 –

The inventors, Stuart Antcliff, John Regnault, and Laurence Bradley, filed the original application for the '835 patent with the United States Patent and Trademark Office ("PTO") on July 19, 1996. The inventors claim priority based on an April 4, 1996 United Kingdom application for the same method.[4] On March 11, 1997, the inventors filed a continuation-in-part application with the PTO. On March 29, 1999, the first Office Action issued, wherein the Examiner (i) rejected application claims 1, 2, 6, and 8–10 as having been anticipated by a patent to Graber, U.S. Patent No. 5,712,979, and (ii) rejected application claims 3–5 and 11–28 as being obvious over the Graber patents, in view of Weinman, "The CGI Book."

On July 28, 1999, the applicants responded to the Office Action by (i) cancelling claims 1–28 and, in place of those, (ii) adding application claims 29–46. More specifically, where application claim 1 required that the signal identify the 'origin' of the request, application claim 29 requires an identification signal to identify "an originating file from which said request originated." In addition to the new claims, the inventors argued that the obviousness rejection over the combination of Graber and the "CGI Book" was now addressed by the amended claims. In particular, the inventors argued that the "CGI Book" did not use identification signals; instead, it used an authorization process that required the manual entry of a user ID and password and, therefore, the "CGI Book" did not provide the identification element missing from the Graber patent.

---

[4] Following the issuance of the '835 patent, the inventors, all BT employees, assigned the patent to BT. Then, via a series of assignments, beginning with the BT assignment to IPValue, the patent was assigned to Suffolk. *See Suffolk Technologies, LLC v. AOL, Inc.*, --- F.Supp.2d ---, 2012 WL 6125377, at *2–3 (E.D. Va. Dec. 7, 2012) (Mem. Op.) (discussing history of the '835 patent title and finding that Suffolk had all right, title, and interest, and therefore standing to sue for infringement).

– 3 –

On October 12, 1999, the Examiner allowed all of the pending claims of the amended application and, as a result, application claim 29 issued as independent claim 1 of the '835 patent. The remaining 17 claims are dependent on claim 1.

The '835 patent consists of eighteen claims. The claims in issue at the time of the issuance of the Order setting forth the *Markman* determinations read as follows:

1. A method of operating a file server, said method comprising the steps of:

receiving a request for a **file**;

determining if the request includes a received **identification signal** identifying an originating file from which said request originated;

comparing any said received identification signal with one or more predetermined **identification signals**; and

deciding which **file**, if any, is to be supplied in dependence upon said determining and comparing steps, and if in the deciding step it is decided that a **file** is to be supplied, supplying said **file**.

Claims 2, and 6 through 9 depend on claim 1:

2. A method as in claim 1 wherein said supplied file is supplied only if said identification signal matches a said predetermined identification signal.

6. A method as in claim 1 wherein said deciding step further comprises **generating said supplied file**.

7. A method as in claim 1 wherein said request conforms to a hypertext transfer protocol.

8. A method as in claim 7 wherein said received identification signal includes a universal resource location address for said origination from which the request originated.

9. A method as in claim 1 in which said file server is connected to the internet and wherein said request is received via the internet.

The parties dispute the meaning of three claim terms, in bold above, as used in independent claim 1 and dependent claim 6. They are:

(i)     "**file**," as used in claim 1;

– 4 –

(ii)     "**identification signal**," as used in claims 1 and 2; and,

(iii)    "**generating said supplied file**," as used in claim 6.

Further, Google argues that "**identification signal**" should be construed as used in two separate

phrases. Specifically, Google argues that the following phrases require construction:

(i)     "received identification signal identifying an originating file from which said
        request originated," as used in claim 1; and,

(ii)    "predetermined identification signal" as used in claims 1 and 2.

As explained below, the uniform construction of the term "**identification signal**" obviates the

need to construct these additional terms. Accordingly, the only terms requiring construction are:

(i) "file, (ii) "identification signal," and (iii) "generating said supplied file."

## II.

Over the nearly two decades since *Markman*, the elucidation of claim construction

principles has become well-plowed ground, although the plowed furrows have not always been

straight lines. Nonetheless, the claim construction principles pertinent here are now well-

settled.[5] They are as follows:

First, and importantly, "the claim construction analysis must begin and remain centered

on the claim language itself" because a "bedrock principle" of patent law is that "the claims of a

patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure*

*Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115–16 (Fed. Cir. 2004).

Accordingly, a court must "look to the words themselves . . . to define the scope of the patented

invention." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).   And the

---

[5] The Federal Circuit's en banc opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir.
2005), sets forth the bedrock principles of claim construction. *See also* Patent Claim
Construction in the Federal Circuit (Edward D. Manzo ed., 2012).

"words of a claim are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention, *i.e.*, as of the effective filing date of the patent application." *Id.* at 1313. A person of ordinary skill in the art "is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). In the event the ordinary meaning of a claim is not apparent, then a court—just as would a person of ordinary skill in the art—may look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water*, 381 F.3d at 1116. In general, courts engaging in claim construction follow a hierarchy of evidence: (i) claim language, (ii) other intrinsic evidence—*i.e.*, the specification, the remainder of the patent, and the prosecution history, and (iii) extrinsic evidence—*i.e.*, evidence that is external to the patent and prosecution history, such as expert testimony, dictionaries, or treatises. *See Advanced Cardiovascular Sys. v. Medtronic*, 265 F.3d 1294, 1304 (Fed. Cir. 2001). Importantly, the claim construction effort should focus on the intrinsic evidence, and only if that evidence does not yield the answer, should a court proceed to extrinsic evidence. *Vitronics*, 90 F.3d at 1583.

The Federal Circuit has recognized that the specification is "the single best guide to the meaning of a disputed term" and is often "dispositive." *Phillips*, 415 F.3d at 1315. Yet, courts must be cautious in using the specification to avoid limiting the scope of the claims by importing limitations of such embodiments into the scope of the claims. In this respect, there is "a fine line

– 6 –

between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Id.* at 1323. Indeed, to read "a limitation from the written description into the claims" is a "cardinal sin" of patent claim construction. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340–41 (Fed. Cir. 2001).

It is true, of course, that "a patentee is free to be his own lexicographer" and to give claim terms his own specific meaning. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). When a patentee acts as his own lexicographer, he may "use terms in a manner other than their ordinary meaning[.]" *Vitronics*, 90 F.3d at 1582. Importantly, a patentee acting as his own lexicographer must "define the specific terms used to describe his or her invention . . . with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Thus, any statement in the specification relied on to support the contention that the patentee acted as his own lexicographer "must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). Although a patentee may "define claim terms by implication,"[6] the implied redefinition must also "be so clear that it equates to an explicit one." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012).

Thus, the claim construction analysis here begins with the application of these principles to the disputed claim terms. But importantly, as the Federal Circuit has noted, these "axioms themselves seldom provide an answer, but instead merely frame the question to be resolved." *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004). Indeed, the Federal

---

[6] *Bell Atl. Network Servs., Inc. v. Covad Comm'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).

Circuit's guidance on claim construction does "not attempt to provide a rigid algorithm, but simply attempt[s] to explain why, in general, certain types of evidence are more valuable than others." *Phillips*, 415 F.3d at 1324.

## III.

### A. "file"

The term "file" appears throughout the claims of the '835 patent. The parties agree in part on the definition, namely that a file is a "collection of information." Suffolk proposes the construction, "a collection of information that is treated as a unit," while Google proposes the construction, "a collection of information stored as a unit and identifiable by its location on a file server, in a directory, by a name." The claim construction principle that is dispositive here is that the specification is the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. The application of this principle to the '835 patent compels the conclusion that "file" means "a collection of information that is treated as a unit and stored on, or created by, a server."

Here, a reading of the specification and claim 1 makes clear that a file at least has the meaning of "a collection of information that is treated as a unit." And it is also clear from a close reading of claims that a file must either exist on, or be created by, a server. This limitation is necessary as the only "file" contemplated by the claim is one that exists, or can be created by, a server. Claim 1 contemplates two files, an originating file that makes the request, and the requested file. Yet, both files must either exist on a server or be created by a server. If the originating request arises from a file, the only originating file contemplated by the claim is a file obtained from another server that is generating the request for the second file. The requested file may either be (i) a file that already exists on the server or (ii) a file that is generated—created or

– 8 –

tailored—by a server in response to the request. Accordingly, a file must exist on, or be created by, a server.

Google argues that file must be defined to mean that it is identified by its location on a file server, in a directory. But this meaning does not encompass the patent's claim involving the creation of a file by a server in response to a request. It is clear from the claims that this generated file is not limited to one that is identifiable by its location—indeed, it does not exist until the server creates it in response to a request. *See* '835 Patent, 6:39–41 ("In this embodiment the server runs an application which takes in the referrer address and generates a new HTML file.") Google also makes a further argument to the effect that the patent requires that a 'file' be located in a directory, by name and, in support of this, Google points to the language discussing identifying files by the URL. This argument also fails, as the '835 Patent makes clear that such a means of identifying a file is only one embodiment, and "the invention may also be applicable to FTP . . . and Telnet applications and other such future applications." '835 Patent, 7:24–28. Accordingly, it would be a cardinal sin to import a limitation on the claim from the embodiments. *See Phillips*, 415 F.3d at 1323 (noting the fine line between reading "a claim in light of the specification" and impermissibly "reading a limitation into the claim from the specification").

### B. "identification signal"

The term "identification signal" appears in independent claim 1, as well as in several dependent claims of the '835 patent. The parties disagree on the proper construction of this phrase; as is typical in these disputes, the patentee seeks a broad construction of the term to enlarge the scope of the patent coverage, while the putative infringer seeks a construction with an eye toward vindicating its non-infringement or invalidity arguments. Here, Suffolk, on the one

hand, contends that only the phrase "identification signal" requires construction and that the proper construction of this phrase is "digital information that identifies a file." Google, on the other hand, contends two separate phrases appearing in claim 1 that include "identification signal" must be construed separately. Google proposes that "received identification signal identifying an originating file" means "unique source-identifying information for the requesting file." Google then proposes that "predetermined identification signals" means "predetermined source identifying information (e.g., file or server address)."

Two claim construction principles are pertinent here. First, "a claim should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent"[7] and second, that the specification is the "best guide to the meaning of a disputed term."[8] These principles, applied here, point persuasively to the conclusion that a person of ordinary skill in the art would conclude that "identification signal" is properly construed uniformly throughout the patent as "digital information that identifies the source, origin, or location of a file."

To begin with, no one disputes that "identification signal" is "digital information." And the key to giving a uniform definition consistent with the intrinsic evidence is the fact that the patent claims and the specification clearly refer to the "identification signal" conveying some identifying information. Indeed, the parties agree on this point, but disagree whether and how this should be taken into account in defining "identification signal." It is clear from a close reading of the specification and the claims that the identification signal must convey some information about the source, origin, or location of the file. First, the summary of the invention explains that the method uses the "referrer address or URL . . . to identify the route taken in

---

[7] *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

[8] *Phillips*, 415 F.3d at 1315.

requesting the file from the internet server." '835 Patent, 3:47–49. Thus, the method uses digital information, namely the referrer address or URL, that identifies the source, origin, or location of the request as the identification signal.

Second, each embodiment in the patent specification contemplates the use of the URL from the referring address field of the request as an identification signal. [9] And this URL conveys information about the source, origin, or location of the requesting file. As the '835 patent explains, "[s]ince the HTTP protocol provides for the transmission of the URL of the HTML file . . . , the server which receives the request . . . can determine the origin of the request[.]" '835 Patent, 5:10–14. Thus, in one embodiment, the "server looks at this referrer address [the URL of the HTML file from which the request originated] and decides what file to send to the browser using the referrer address[.]" *Id.* at 4:66–5:1. In other words, this embodiment is using digital information about the source, origin, or location of a file as an identification signal. In another embodiment, the "server looks at the referrer address which refers to the URL of the HTML file . . . and the server runs an application using the referrer address . . . [to] generate an HTML file[.]" *Id.* at 6:27–33. Thus, this embodiment also uses digital information about the source, origin, or location of a file as the identification signal.

Finally, even though the specification provides that the invention is not restricted to hypertext transfer protocol, and may also be applicable to "FTP (File Transfer Protocol) and Telnet applications and other such future applications," *id.* at 7:25–28, it is clear that regardless of the application used to request a file from the server, the identification signal provides specific information about the requesting file's origin, source, or location. Accordingly, a close

---

[9] These embodiments do not limit the claims of the '835 patent to HTTP—to import such a limitation would be a "cardinal sin" of claim construction. *See SciMed Life Sys.*, 242 F.3d at 1340–41.

– 11 –

examination of the specification makes clear that an "identification signal" is properly construed to mean "digital information that identifies the source, origin, or location of a file."

Instead of constructing only the term "identification signal," Google has identified and offered construction for two separate phrases. Each phrase identified by Google consists of the disputed term "identification signal" and a modifier. Thus, Google does not argue that "identification signal" must have two separate constructions; instead, Google argues that the "received identification signal" phrase has a different meaning from the "predetermined identification signal." First, Google is correct in supplying a consistent definition of "identification signal," as where a word is used in conjunction with two different modifiers, the word "presumptively should carry the same meaning throughout the patent." *Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1337 (Fed. Cir. 2008). Second, Google is also correct in arguing that the two phrases which it identified have different meanings. Yet, Google's proposed definitions are redundant at best, and would more likely merely serve to introduce confusion rather than clarity. The difference in meaning between the two phrases identified by Google is made clear by application of the plain language of Claim 1 to a uniformly defined "identification signal."

Suffolk argues that "identification signal" need only be construed as "digital information that identifies a file," because someone of ordinary skill in the art at the time of the invention would understand "signal" to mean "digital information," and thus the combination of "identification" with "signal" leads to the construction "digital information that identifies a file." Yet, this argument is not persuasive because it is clear from the specification that the "identification signal" conveys specific information about the requesting file, namely the origin, source, or location of the file. *See e.g. id.* 3:51–52 ("[b]y interrogating the referrer address, a

– 12 –

second server is able to control access"); 3:67–4:1 ("the sever is able to identify from which web page the HTML file request is made); 4:66–67 ("the server looks at this referrer address and decides what file to send to the browser").

### C. "generating said supplied file"

The term "generating said supplied file" appears in claim 6. The parties agree on part of the definition, namely "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon." But they disagree as to the remainder of the definition. Suffolk argues that the proper construction is "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the originating file." In contrast, Google argues that the proper construction is "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal identifying an originating file." The basic claim construction principle that courts should first look to the language of the claims themselves is dispositive. *See Innova/Pure Water*, 381 F.3d at 1116. Thus, "generating said supplied file" is properly construed to mean "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal."

The term "generating said supplied file" appears in claim 6, which states in full "[a] method as in claim 1 wherein said deciding step further comprises generating said supplied file." Claim 6, then, directs a reader of the patent to the deciding step in claim 1, which states, in pertinent part, "deciding which file, if any, is to be supplied in dependence upon said determining and comparing steps[.]" Thus, this step then directs the reader to the determining and comparing steps of claim 1, which provide, in pertinent part,

> determining if the request includes a received identification signal identifying an originating file from which said request originated;
>
> comparing any said received identification signal with one or more predetermined identification signals[.]

– 13 –

It is clear, then, from the language of claims 1 and 6, viewed together, that "generating said supplied filed" is a step that occurs after the server decides which file to send, pursuant to the deciding step of claim 1. In order to engage in the deciding step, the server must have engaged in the determining and comparing steps, both of which depend on the received identification signal. Put simply, the only way a server in the '835 patent can go about creating or tailoring a file in claim 6 is by processing the "identification signal" in claim 1. Thus, "generating said supplied file" must mean "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal" (claim 1's determining, comparing, and deciding step). This result is further compelled by claim 1's determining and comparing steps—both of which are required by claim 1's deciding step upon which claim 6 depends—which rely upon the received identification signal.

Suffolk argues that adopting this construction would be erroneous because the patentees have acted as their own lexicographer, and therefore, the term "generating said supplied file" has a special meaning, as used in the '835 patent. Suffolk cites several cases for the general proposition that a patentee may implicitly act as his own lexicographer. *See, e.g., Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1382–83 (Fed. Cir. 2011); *SciMed Life Sys.*, 242 F.3d at 1339–44. In addition, Suffolk points to the specification, wherein the example of the content that would be generated by claim 6 is described as "in dependence upon the current web page being displayed by the browser[.]" '835 Patent at 4:2–7.

This argument is unpersuasive. The Federal Circuit has made clear that "the 'implied' redefinition must be so clear that it equates to an explicit one." *Thorner*, 669 F.3d at 1368. In *Thorner*, the Federal Circuit explained that "[s]imply referring to two terms as alternatives or disclosing embodiments that all use the term the same way is not sufficient to redefine a claim

– 14 –

term." *Id.* Here, there simply has not been an implicit "redefinition" that is so clear as to equate an explicit redefinition.  Indeed, there does not appear to have been any "redefinition," explicit or implicit, as the specification is consistent with the plain language of the claims.  Every embodiment that discusses the generation of files describes such generation as depending on an identification signal (e.g., the URL in the referring address information of the HTML file).  And the embodiment that specifically describes claim 6 explains that "the server runs an application which takes in the referrer address [identification signal] and generates a new HTML file."  '835 Patent at 6:39–41.  Accordingly, it is clear that the "creating or tailoring of a file" that occurs in claim 6 is in dependence upon the received identification signal and thus, there is nothing in the specification to support Suffolk's contention that the patentee was impliedly acting as his own lexicographer.

IV.

In summary, for the reasons stated, the disputed claim terms are determined to have the following constructions:

- **"file"**: "a collection of information that is treated as a unit and stored on, or created by, a server."

- **"identification signal"**: "digital information that identifies the source, origin, or location of a file."

- **"generating said supplied file"**: "creating or tailoring a file, as distinct from selecting an existing file, in dependence upon the received identification signal."

An Order issued on February 25, 2013 setting forth these claim construction determinations.

Alexandria, VA
April 18, 2013

/s/

T. S. Ellis, III
United States District Judge

– 15 –

F I L E D

APR 16 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| SUFFOLK TECHNOLOGIES LLC, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AOL INC. AND GOOGLE INC., | ) |
| Defendants. | ) |

Case No. 1:12cv625

## ORDER

The matter is before the Court on Google Inc.'s ("Google") motion for summary

judgment (doc. 259). Google argues that there are no triable material issues of fact relating to

the anticipation of Claims 1, 6, 7, 8, and 9 of U.S. Patent No. 6,081,835 by the Gundavaram Post,

and that there are no triable material issues of fact relating to infringement of the '835 patent by

Google's Adsense for Content service. Suffolk Technologies LLC ("Suffolk") opposes this

motion, arguing that (i) there are substantial evidentiary issues relating to the Gundvaram Post,

(ii) there are triable issues of material fact relating to the Gundavaram Post, and (iii) there are

triable issues of material fact relating to infringement of the '835 patent by Google.

The matter has been fully briefed and argued, and is now ripe for decision.

The legal standard for summary judgment is well-settled. Summary judgment is

appropriate where "there is no genuine issue as to any material fact" and "the moving party is

entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.; *SRI Int'l v. Matsushita

Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985). Once the motion for summary

judgment has been made, the non-moving party has the burden of demonstrating a genuine issue

of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (non-movant must set forth

– 1 –

**JA00025**

"sufficient facts showing that there is a genuine issue for trial"). Yet, "[a]ll evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences should be drawn in favor of the non-moving party." *Pfaff v. Wells Electronics, Inc.*, 5 F.3d 514, 517 (Fed. Cir. 1993); *Anderson*, 477 U.S. at 255 (the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").

Under 35 U.S.C. § 102(a)(1), a person is not entitled to a patent if the claimed invention was "described in a printed publication . . . before the effective filing date of the claimed invention." And a claim is anticipated under § 102(a)(1) "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987); *see SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008). Whether a "reference is a 'printed publication' under [§ 102(a)] involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). The Federal Circuit has explained that "dissemination and public accessibility are the keys to the legal determination whether a prior art was 'published.'" *Id.* at 1348 (quoting *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989)). Thus, in *SRI International*, the Federal Circuit held that posting an academic paper on an internet FTP server could satisfy the printed publication requirement, if the party seeking to invalidate the patent could show that the FTP server was publicly accessible. 511 F.3d at 1195–98. The moving party bears the "burden to show invalidity of an issued patent by clear and convincing evidence[.]" *Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1998).

– 2 –

A review of the record evidence makes clear that there are no triable issues of material fact as to whether the Gundavaram Post is authentic, relevant, and anticipates Claims 1, 7, 8, and 9 of the '835 patent. First, it is clear that the Gundavaram Post is admissible and authentic. A document may be authenticated through "[t]estimony that an item is what it is claimed to be." Rule 901(b)(1), Fed.R.Evid. Shishir Gundavaram has authenticated the post, by testifying that he recognized "the style of my writing," "certain stylistic things in the code," and "certainly the e-mail address that I wrote from[.]" Gundavaram Dep. 27:3–7. And Gundavaram recalled writing this post "in the summer of '95." *Id.* 26:12. In addition to Gundavaram's testimony, the date stamps of the Gundavaram Post and related posts indicate that Gundavaram's Post was made during the summer of 1995. Suffolk relies on a single triable issue of fact with respect to the Gundavaram Post, by referring to an archive—www.webserverforum.com—that indicates the date of the Gundavaram Post to be 900 days later. In fact, the record discloses that the archive consistently forward-dates all posts by 900 days and therefore, that archive is plainly unreliable. Moreover, even within that archive, replies to the Gundavaram Post contain dates that confirm that the Gundavaram Post was made during the summer of 1995. So by clear and convincing evidence, the Gundavararm Post is an authentic, valid, and admissible printed publication.

Second, the Gundavaram Post is relevant, as it was publicly available in 1995, well before the April 4, 1996 United Kingdom application filing date for the '835 patent. Gundavaram testified that at the time of the post, the newsgroup was publicly available in 1995 and it was "syndicated across to almost all of the universities across the U.S. and around the world . . . [and there were] a lot of corporations, but primarily schools and colleges." *Id.* 31:10–20.

– 3 –

Finally, there is substantial and unrebutted record evidence that the Gundavaram Post anticipates each element of Claims 1, 7, 8, and 9 of the '835 patent. Google's expert, G. Mark Hardy, opined that the Gundavaram Post anticipates Claims 1, 7, 8, and 9. Suffolk's expert, V. Thomas Rhyne, in his original expert rebuttal report, stated that he did not have an opinion as to whether the Gundavaram Post anticipates Claims 1, 7, 8, and 9. In addition, Dr. Rhyne testified that he has not "offered an opinion one way or the other and I don't have an opinion one way or the other." Rhyne Deposition 62:8–16. Although Dr. Rhyne did supplement and amend his expert rebuttal report following the Court's *Markman* claim construction Order to opine that Gundavaram did not anticipate Claim 1, his amendments relating to Gundavaram and Claim 1 were stricken as untimely by Order dated March 22, 2013. Suffolk has offered no rebuttal to Google's expert's opinion that the Gundavaram Post anticipates Claims 1, 7, 8, and 9 of the '835 patent, and accordingly, Google has met its burden of showing, by clear and convincing evidence, that Claims 1, 7, 8, and 9 of the '835 patent are invalid. Thus, partial summary judgment must be granted as to anticipation of those claims.

In contrast to Claims 1, 7, 8, and 9, Suffolk's expert has consistently opined that the Gundavaram Post does not anticipate Claim 6. Thus, there remains a triable issue of material fact and summary judgment must be denied with respect to anticipation of Claim 6 by the Gundavaram Post.

With respect to infringement, a review of the record evidence reveals that there remain substantial triable issues of material fact. Put simply, there is substantial disagreement between Google's expert and Suffolk's expert as to how Google's Adsense for Content functions and whether it infringes the '835 patent. At this point, there is no sound basis for rejecting the

– 4 –

opinion offered by either expert. Accordingly, summary judgment must be denied as to infringement.

For these reasons, and for good cause,[1]

It is hereby **ORDERED** that Google's motion for summary judgment (doc. 259) is **GRANTED IN PART**, insofar as Claims 1, 7, 8, and 9 are invalid as they are anticipated by the Gundavaram Post.

It is further **ORDERED** that Google's motion for summary judgment is **DENIED IN PART**, insofar as it must be denied in all other respects.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
April 16, 2013

T. S. Ellis, III
United States District Judge

---

[1] These reasons may be more fully set forth in a forthcoming memorandum opinion.

– 5 –

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUFFOLK TECHNOLOGIES LLC,⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No. 1:12cv625
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
AOL INC. AND GOOGLE INC.,⠀⠀⠀⠀)
⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀)

## ORDER

The matter came before the Court on defendant's motion to stay pending re-examination (doc. 358) and motion to strike the supplemental expert reports of Dr. V. Thomas Rhyne and Roy Weinstein (doc. 388). The parties fully briefed the motions and presented extensive oral argument.

For the reasons stated from the Bench, and for good cause,

It is hereby **ORDERED** that defendant's motion to stay (doc. 358) is **DENIED**.

It is further **ORDERED** that defendant's motion to strike supplemental expert reports (doc. 388) is **GRANTED IN PART** insofar as the following materials are **STRICKEN**:

(i)⠀⠀The Supplemental Expert Report of Roy Weinstein Regarding Defendant Google Inc.; and,

(ii)⠀⠀Paragraphs 108, 109, and 110; 114 and 115 of the Supplemental and Amended Rebuttal Expert Report of Dr. V. Thomas Rhyne Regarding Validity of the Asserted Claims of U.S. Patent No. 6,081,825 Following the Court's Claim Construction Order.

It is further **ORDERED** that defendant's motion to strike supplemental expert reports (doc. 388) is **DEFERRED IN PART** with respect to the Supplemental and Amended Expert

Report of Dr. V. Thomas Rhyne, III Regarding Infringement of the Asserted Claims of U.S. Patent No. 6, 081,835 Following the Court's Claim Construction Order.

It is further **ORDERED** that plaintiff is **DIRECTED** to produce Dr. V. Thomas Rhyne for a deposition, which must be conducted promptly at a time and location mutually convenient to the parties, in order to permit defendant to examine Dr. Rhyne with respect to paragraphs 206, 207, 208, and 217; and 181 to 184, 187, 195, 196, 199, 202, 212, 227, 231, 235, 244, 253, 256 to 259, 263, and 264 of the supplemental and amended expert report regarding infringement.

It is further **ORDERED** that the parties are **DIRECTED** to submit within one week of the deposition simultaneous supplemental memoranda presenting any further argument on defendant's motion to strike Dr. Rhyne's supplemental and amended expert report regarding infringement in light of the new deposition.

It is further **ORDERED** that defendant's motion to strike supplemental expert reports (doc. 388) is **DENIED** in all other respects.

It is further **ORDERED** that the parties are **DIRECTED** to submit (i) proposed jury instructions, (ii) proposed verdict forms, and (iii) any proposed voir dire questions by 5:00 p.m. Thursday, April 18, 2013.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
March 22, 2013

_____
T. S. Ellis, III
United States District Judge

JA00031

I L E D

APR 1 2 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

SUFFOLK TECHNOLOGIES LLC,    )
    **Plaintiff,**    )
    )
    v.    )    **Case No. 1:12cv625**
    )
AOL INC. AND GOOGLE INC.,    )
    **Defendants.**    )

## ORDER

The matter is before the Court on defendant Google Inc.'s ("Google") motion to exclude

the testimony of Roy Weinstein (doc. 267). Google argues that the testimony of Roy Weinstein

is inadmissible under Rule 702, Fed. R. Evid., and *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579, 591 (1993). In essence, Google argues that Dr. Weinstein's damages opinion

is insufficiently tied to the facts of this case. Suffolk Technologies LLC ("Suffolk") opposes this

motion, arguing that Dr. Weinstein's damages opinion is properly tied to the facts of this case, is

based on sound methodology, and thus is admissible under Rule 702, Fed.R.Evid., and *Daubert*.

The matter has been fully briefed and argued, and is now ripe for decision.

In a patent infringement suit, 35 U.S.C. § 284 provides that upon finding infringement of

a valid patent, damages shall "in no event [be] less than a reasonable royalty for the use made of

the invention by the infringer, together with interest and costs as fixed by the court." The

Federal Circuit has explained that, in "litigation, a reasonable royalty is often determined on the

basis of a hypothetical negotiation, occurring between the parties at the time that infringement

began." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011) (citing *Wang*

*Labs. Inc. v. Toshiba Corp.*, 993 F.2d 858, 869–70 (Fed. Cir. 1993)).

– 1 –

It is settled law that the "patentee bears the burden of proving damages." *Uniloc USA*, 632 F.3d at 1315 (Fed. Cir. 2011). And properly "to . . . carry this burden, the patentee must 'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Id.* (quoting *Daubert*, 509 U.S. at 591) (alteration in original). If the "patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Id.* Thus, the Federal Circuit has made clear that a "major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case." *Id.* at 1316. And any evidence "unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute." *Id.* (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). Consistent with these principles, the Federal Circuit rejected a 25% rule of thumb "as an arbitrary, general rule, unrelated to the facts of the case," and accordingly, held that the use of such a "rule fails to pass muster under *Daubert*[.]" *Id.* at 1318.

In *Uniloc*, the damages expert based his damages opinion on the "so-called 25 percent rule of thumb, hypothesizing that 25% of the value of the product would go to the patent owner and the other 75% would remain with [the infringer.]" *Id.* at 1311. The expert then considered the *Georgia–Pacific*[1] factors, "with the idea being to adjust this 25% up or down depending on how [the *Georgia–Pacific* factors] favor[ ] either party." *Id.* (alterations in original). The expert then opined that the factors in favor of each party "generally balanced out and did not change the royalty rate." *Id.* The Federal Circuit rejected the application of this 25% rule of thumb, because "there must be a basis in fact to associate the royalty rates . . . to the particular hypothetical negotiation at issue in the case." *Id.* at 1317. The Federal Circuit explained that the

---

[1] *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970).

– 2 –

25 percent rule of thumb as an abstract and largely theoretical construct fails to satisfy this fundamental requirement. The rule does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party. Relying on the 25 percent rule of thumb in a reasonable royalty calculation is far more unreliable and irrelevant than reliance on parties' unrelated licenses, which we rejected in *ResQNet* and *Lucent Technologies*.

*Id.* The subsequent application of the *Georgia–Pacific* factors was "of no moment," as "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.* Accordingly, the Federal Circuit explained that the "use of such a rule fails to pass muster under *Daubert*[.]" *Id.* at 1318.

Here, Suffolk's damages expert, Roy Weinstein, has arguably applied the *Georgia–Pacific* factors to the revenue stream associated with the putative infringing product and then conducted a hypothetical negotiation. Yet, the hypothetical negotiation conducted by Weinstein, based on the Nash Bargaining Solution ("NBS"), does not appear to be tied to the facts of this case. Instead, Weinstein appears to summarily conclude summarily that the result of this hypothetical negotiation would be a "50/50 split of the incremental profits attributable to the patent-in-suit." Expert Report of Roy Weinstein Regarding Defendant Google, Inc., ¶ 160 ("Weinstein Report"). Weinstein's damages opinion is, in essence, (i) the application of *Georgia–Pacific* factors, followed by (ii) the application of a 50/50 split, derived from the NBS.

Put simply, Weinstein's damages opinion is not meaningfully distinguishable from the damages opinion rejected in *Uniloc*. There, the expert first applied a theoretical rule of thumb and then applied the *Georgia–Pacific* factors; here, Weinstein first applied the *Georgia–Pacific*

JA00034

factors and then applied a theoretical rule of thumb, albeit one clothed as the NBS.[2] The order in which the *Georgia-Pacific* factors are applied does not change the fundamental and fatal flaw of both calculations, namely that the hypothetical rule of thumb was not tied to the facts of the case. *See Oracle Am., Inc. v. Google Inc.*, 798 F.Supp.2d 1111, 1119 (N.D. Cal. 2011) ("The Nash bargaining solution would invite a miscarriage of justice by clothing a fifty-percent assumption in an impenetrable facade of mathematics."). Accordingly, the Weinstein's damages opinion must be excluded pursuant to Rule 702, Fed.R.Evid., and *Daubert*.

Suffolk opposes this motion to exclude, arguing, in essence, that Weinstein's use of the NBS was tied to the facts of this case, and therefore, distinguishable from the 25% rule of thumb in issue in *Uniloc*. Yet, it is unclear how the NBS was tied to the facts of this particular case. In his damages report, Weinstein explains,

> Since apportionments for Google's contributions, non-infringing functionality, and a hypothetical non-infringing alternative have already been backed out of the calculation, the parties would have been willing to accept a 50/50 split of the incremental profits attributable to the patent-in-suit.

Weinstein Report, ¶ 160. Weinstein does not explain why *these* parties would have accepted a 50/50 split. Thus, the "50/50 split" is plainly not tied to the facts of this case and is essentially no different from the 25% rule of thumb rejected in *Uniloc*.

In summary, Weinstein's use of the NBS to opine that the hypothetical negotiation of the parties would result in a "50/50 split of the incremental profits attributable to the patent-in-suit"

---

[2] Weinstein's description of the NBS is telling. Dr. Weinstein explains that "the NBS does not always produce a 50/50 split of incremental profits associated with an agreement. Differences in bargaining power can tip the scale in favor of one part of the other, as could other factors identified in the Georgia-Pacific case[.]" Weinstein Report, ¶ 66. The NBS, as described by Dr. Weinstein, appears strikingly similar to the 25% rule of thumb in *Uniloc*, which was a 25/75 split that was adjusted on the basis of the *Georgia-Pacific* factors.

is not adequately tied to the facts of the case. This is indistinguishable from the 25% rule of thumb in issue in *Uniloc*, and accordingly, Dr. Weinstein's expert report must be excluded.

For these reasons, and for good cause,[3]

It is hereby **ORDERED** that Google's motion to exclude the testimony of Roy Weinstein (doc. 267) is **GRANTED**, and accordingly, the testimony of Roy Weinstein is **EXCLUDED**. If necessary, a separate order will address Google's pending motion *in limine* concerning Roy Weinstein.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, VA
April 12, 2013

_____
T. S. Ellis, III
United States District Judge

---

[3] These reasons may be more fully set forth in a forthcoming memorandum opinion.

– 5 –

US006081835A

# United States Patent [19]

## Antcliff et al.

[11] **Patent Number:** 6,081,835

[45] **Date of Patent:** Jun. 27, 2000

[54] **INTERNET SERVER AND METHOD OF CONTROLLING AN INTERNET SERVER**

[75] Inventors: **Stuart J. Antcliff; John C. Regnault; Laurence D. Bradley,** all of Suffolk, United Kingdom

[73] Assignee: **British Telecommunications public limited company,** London, United Kingdom

[21] Appl. No.: **08/815,468**

[22] Filed: **Mar. 11, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/684,257, Jul. 19, 1996, abandoned.

[30] **Foreign Application Priority Data**

Apr. 4, 1996 [GB] United Kingdom .................. 9607152

[51] **Int. Cl.**$^7$ ............................. G06F 13/33; G06F 15/17

[52] **U.S. Cl.** ............................................. 709/217; 709/229

[58] **Field of Search** .............................. 709/217, 218, 709/219, 203, 229; 707/501, 513

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,530,852 | 6/1996 | Meske, Jr. et al. . |
| 5,572,643 | 11/1996 | Judson . |
| 5,678,041 | 10/1997 | Baker et al. . |
| 5,712,979 | 1/1998 | Graber et al. . |
| 5,717,860 | 2/1998 | Graber et al. . |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO 97/11429 | 3/1997 | WIPO | . |
| WO 97/11430 | 3/1997 | WIPO | . |

### OTHER PUBLICATIONS

Lewontin, "The DCE Web Toolkit: Enhancing WWW Protocols with Lower–Layer Services", Computer Networks and ISDN Systems, vol. 27, No. 6, Apr. 1, 1995, pp. 765–771.

http://home.netscape.com/newsref/std/cookie_spec.html, "Persistent Client State HTTP Cookies", Feb. 9, 1998, pp. 1–5.

draft–kristol–http–state–mgmt–00.ps, "Proposed HTTP Statement Management Mechanism", Feb. 22, 1996, pp. 1–11.

http://www.w3.org/Protocols/HTTP/HTRQ_Headers.html, "HTTP Request Fields", Feb. 10, 1998, pp. 1–5.

Brown, "Using Netscape 2" Second Edition, Chapter 16, pp. 407–410.

(List continued on next page.)

*Primary Examiner*—Mark H. Rinehart
*Attorney, Agent, or Firm*—Nixon & Vanderhye P.C.

[57] **ABSTRACT**

An internet server is controlled wherein the server receives a hypertext transfer protocol file request from a web browser over the internet and any identification signal included with the hypertext transfer protocol file request. The identification signal is compared with one or more predetermined identification signals and depending upon the result of the comparison a file may be transmitted from the server to the web browser.

**18 Claims, 7 Drawing Sheets**



**6,081,835**

Page 2

## OTHER PUBLICATIONS

Weinman, The CGI Book, Mar. 1, 1996, pp. 117–120; pp. 203–208.

Voelker et al, "MObisaic: An Information System for a Mobile Wireless Computing Environment", Proceedings, Workshop on Mobile Computing Systems and Applications (Cat. No. 94TH06734), Workshop on Mobile Computing Systems and Applications, Santa Cruz, CA, USA, Dec. 8–9, 1994, ISBN 0–8186–6345–6, 1995, Los Alamitos, CA., USA, IEEE Comut. Soc. Press. USA, pp. 185–190, XP002013678.

Chu et al., "Creating a Hypertext Markup Language Document for an Information Server", 24th Annual Meeting of the Society for Computers in Psychology (SCIP), St. Louis, MO, USA, Nov. 10, 1994, vol. 27, No. 2, ISSN 0743–3808, Behavior Research Methods, Instruments, & Computers, May 1995, USA, pp. 200–205, XP000567305.

Schulzrinne, "World Wide Web: Whence, Whither, What Next?", IEEE Network, Mar.–Apr. 1996, IEEE Network, Mar.–Apr. 1996, vol. 10, No. 2, ISSN 0890–8044, pp. 10–17, XP000580078.

Leone et al, "Towards a User Environment Integrating Hypermedia Browers, Scientific Visualization Programs and Numerical Simulation Programs", Proceedings of the Workshop on Advanced Visual Interfaces AVI '94, Proceedings of the Workshop on Advanced Visual Interfaces AVI, Bari, Italy, Jun. 1–4, 1994, ISBN 0–08791–733–2, 1994, New York, NY, USA, ACM, USA, pp. 234–236, XP000571293.



**Fig.1**



**Fig.2**

*(PRIOR ART)*



**Fig.3**



**Fig.4**



**Fig.5**



**Fig.6**



**Fig.7**

6,081,835

1

# INTERNET SERVER AND METHOD OF CONTROLLING AN INTERNET SERVER

## RELATED APPLICATION

This application is a continuation-in-part of our earlier commonly assigned U.S. application Ser. No. 08/684,257 filed Jul. 19,1996, now abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to an internet server and method of controlling the internet server.

### 2. Related Art

The internet has developed rapidly over the past few years and has resulted in increased traffic over telecommunications networks. One particular factor which has made the internet more 'user friendly' is the development of the World Wide Web (WWW) service which uses the HyperText Transfer Protocol (HTTP) specification. In order to utilise the WWW service, the user will utilize what is termed a browser, which is software which can interpret hypertext mark-up language (HTML) files which are sent from an internet WWW server to create a web page on the screen of the user's computer. FIG. 1 illustrates a typical internet configuration wherein a user is connected to the internet and uses the WWW service using a browser 1.

In order to initiate the generation of a web page, i.e. to connect to a WWW server such as first server 2, which has a low storage and processor capacity and is linked to the internet via a low bandwidth connection, a request for an HTML file must be transmitted by the browser 1 to the WWW server 2. In order to identify and locate a file in a server from amongst the servers connected to the internet, the file is identified by a universal resource locator (URL). The URL is structured to identify the protocol (which in this case is HTTP), the internet server, the directory of the file in the internet server and the file name. Thus the URL structure is:

http://internet server/directory/file name

When a URL is selected by a user, the browser 1 transmits a file request over the internet to the first server 2 which has the address identified in the URL of the file requested in a HTML file. The first server 2 will then send the HTML file to the browser 1. The browser 1 then interprets the HTML file in order to generate a web page.

The HTML specification allows for text to be displayed and for hypertext links to be included in the web page. Also, the HTML protocol allows graphics or image files to be included in the web page displayed by the browser 1. The HTML protocol thus allows for image files which are to be displayed by the browser 1 to be identified by their URL. When the browser 1 interprets the HTML file returned from the first server 2, if the HTML file includes image URL's, the browser 1 will seek to retrieve the image files using the URL of the image file. Thus, the image or graphics files are retrieved separately to the HTML file and when a web page is displayed by the browser 1, the graphics included in the web page can take longer to display as the file is retrieved after the HTML file.

Since the image file required to complete the web page is identified by a URL there is no requirement for the image file to be located at the first server 2 which supplied the HTML file. Because image or graphics files can be quite large files, the transmission of such files over the internet can take a significant period of time when transmitted over a route with

2

a relatively limited data rate. The ability of a browser 1 to locate and retrieve image or graphics files which are referred to in the web page and which are located anywhere in the internet, allows an internet server providing web pages to utilize this to avoid having to store image or graphics files required to complete the web page created by the HTML file. Further, such a first server can be connected to the internet over a low bandwidth connection without risking a bottleneck. A second server 3 in the internet which has a high storage and processor capacity which hosts the graphics or image files referred to in the web page is thus the subject of bandwidth-consuming graphic file requests from the browser. Such a second server 3 can for instance be an internet server which is connected to the internet over a high bandwidth connection.

FIG. 2 illustrates in more detail a method of operation when such a system of referring to graphics pages at another server is used.

When the browser 1 is initialised, a URL for an HTML file is input or selected by a user in step S1. The browser then requests connection to the server identified in the URL in step S2 and in step S3 the browser connects to the server. The browser then sends a request for the HTML file in step S4 and in step S5 the server sends the HTML file which is then interpreted by the browser in step S6. The web page generated by the interpretation of the HTML file is then displayed in step S7. At this point the web page will include only the text and the hypertext links. In step S8 the browser determines whether the HTML file refers to any image URLs. If not, the browser will await to determine whether any URL is selected for instance using the hypertext links in step S9. If a new URL is selected in step S9 the browser returns to step S2 to request a connection to the same or another server. If no new URL is selected the browser will end requesting files in step S10. If in step S8 it is determined that the HTML file refers to image or graphics URLs, in step S11 the browser requests connection to the second server 3 (or other servers) identified in the URL of the image file. In step S12 the browser connects to the second server 3 (or other servers) and in step S13 the browser 1 sends a request for the image file. The second server 3 then sends the requested image file in step S14 and in step S15 the browser displays the image file within the web page. Step S8 and steps S11 to S15 will be carried out simultaneously to retrieve as many image files as are required, i.e. referred to in the HTML file, in order to complete the web page.

It will be seen from the above that the ability of the HTML protocol to allow an HTML file to refer to image files at any server connected to the internet using the URL, allows the first server 2 to make use of image or graphics files in the second server 3 thus reducing the cost of storage at the first server 2. The first server requires less processing time and less bandwidth to deliver the complete web page to the browser 1. Also, the development of web pages by the operator of the first server 2 is easier and cheaper, since there is no need for the operator to create custom artwork. They are simply able to use images available on other servers.

## SUMMARY OF THE INVENTION

In accordance with one aspect, the present invention provides a method of controlling a server connected to the internet, comprising the steps of

  receiving a file request;

  determining if the file request includes an identification signal identifying the originating file from which said request originated;

  comparing any said identification signal with one or more predetermined identification signals; and

6,081,835

| 3 | 4 |

deciding what file if any is to be transmitted to said user in dependence upon said determining and comparing steps, and if in the deciding step it is decided that a file is to be transmitted, transmitting said file from said server to said user.

The present invention therefore allows the control of access to image or graphics files, or any other high bandwidth files such as digitized sounds or movies.

The file request may be a hypertext transfer protocol file request from a web browser over the internet and the identification signal may identify a web page from which the file request was made. The file to be transmitted is then transmitted to the web browser of the user.

In a preferred embodiment, the file sent to a user may be customised by a server, thus customising the web page displayed by a user's browser, in dependence upon the route taken in arriving at the web page to be displayed i.e. in dependence upon the previous web page.

In accordance with a second aspect, the present invention provides an internet server for connection to the internet comprising

receiver means for receiving a file request;

determining means for determining if the file requested includes an identification signal identifying the originating file from which said request originated;

comparison means for comparing any said identification signal with one or more predetermined identification signals;

decision means responsive to said comparison means for deciding what file if any is to be transmitted to said user; and

an output for outputting a file for tranmission to said user if said decision means decides that said file is to be transmitted.

The present inventors have realised that the HTTP protocol provides that the URL of the HTML file which refers to any image or digitised sound file is included as a 'referrer' address when a request for a file is made to an internet server. Also, the address of the web page is included as a referrer address when a further web page is requested i.e. a further HTML file is requested, using the hypertext links in the web page. Thus, when a file request is made to an internet server, most commercial web browsers e.g. Netscape (trade mark) will comply with the HTTP protocol and will transmit the URL for the web page currently being interpreted by the browser. Thus, the referrer address or URL can be used to identify the route taken in requesting the file from the internet server. This allows the possibility of identifying a first server which is trying to incorporate graphics files from a second server. By interrogating the referrer address, a second server is able to control access to the requested files. This enables the second server to prevent the files being sent. Instead a warning message can be sent, warning that access to the file has been denied. The ability of a second server to identify the originating server allows an operator of a second server to require an operator of a first server to subscribe to allow access to files. The details on the access allowed to the originating server can be stored in a second server to allow the second server to determine at what level access should be allowed to what files.

In addition to the possibility of controlling access to image or sound, or other high bandwidth files, the referrer details transmitted with the file request may inform the server of the web page from which a file request is being made. Thus, if a HTML file is requested from a web page, the server is able to identify from which web page the HTML file request is made and customise the HTML file accordingly. For instance, if the browser requests a HTML file and generates a web page which includes details of a company, the details which are to be displayed can be tailored in dependence upon the current web page being displayed by the browser which could for instance be financial information. The HTML file then transmitted to the browser could be selected from amongst a library of HTML files or specifically generated or tailored to suit the originating web page.

BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention will now be described by way of example only with reference to the accompanying drawings in which:

FIG. 1 is a schematic drawing of the interconnection of a browser with servers over the internet;

FIG. 2 is a flow diagram illustrating the operation of the browser and the servers in accordance with the prior art;

FIG. 3 is a flow diagram illustrating the operation of the browser and servers according to one method of the present invention;

FIG. 4 is a flow diagram illustrating in more detail the operation of the browser and the servers over the internet in accordance with a first embodiment of the present invention;

FIG. 5 is a flow diagram illustrating the operation of the browser and the servers over the internet in accordance with a second embodiment of the present invention;

FIG. 6 is a flow diagram illustrating a further method of operating the browser and servers over the internet in accordance with a third embodiment of the present invention; and

FIG. 7 shows a function block diagram of an internet server according to one embodiment of the invention.

BRIEF DESCRIPTION OF EXEMPLARY EMBODIMENTS

FIG. 3 illustrates one general method in accordance with the present invention. In step S20 a URL or a HTML file is input or selected by a user from the browser. The browser then requests connection to a server identified in the URL in step S21 and in step S22 the browser connects to the server. The browser then sends a request for the HTML file in step S23 and the server sends the HTML file in step S24. The browser then interprets the HTML file in step S25 and displays the web page in step S26. At this point the web page will include only the text and hypertext links. In step S27 it is then determined whether the HTML file refers to any URL's for image files or sound files in step S27. If no files are referred to by the HTML file i.e the web page contains purely text, the browser will determine whether there is a new URL selected in step S28 either manually or via a hypertext link. If a new URL is selected the browser returns to step S21 to request connection to a server. If no new URL is selected the browser will end requesting files in step S29.

If in step S27 it is determined that the HTML file refers to a URL for one or more image files, in step S30 the browser requests connection to another server or servers identified in the URL for the image file. The browser then connects to the other server (or servers) in step S31 and in step S32 the browser sends a request for the image file. In the HTTP protocol, the request for a file includes referrer details which is the URL of the HTML file from which the request originated. In step S33 the server looks at this referrer address and decides what file to send to the browser

6,081,835

5

using the referrer address in step S34. Once the server has decided what file to send to the browser in step S35 the server sends the image file which is then displayed in the web page by the browser in step S36. Steps S27 and S30 to S36 are carried out with one or more servers to acquire all of the image files necessary in order to complete the web page.

Thus in this method a web page refers to image files in another server for completing the web page displayed by the browser. Since the HTTP protocol provides for the transmission of the URL of the HTML file currently being interpreted by the browser, the server which receives the request for the image file can determine the origin of the request i.e. which is the originating server, and can thus decide whether access to the image file is allowed. This is shown in more detail in FIG. 4 where like steps are given like reference numerals. In FIG. 4 step S34 is shown in more detail by steps S34A, S34B and S34C. In step S34A the server compares the referrer address with the allowed addresses i.e. the server stores a table of server addresses identifying the files which the servers are allowed access to. In step S34B it is determined whether access is allowed or not. If access is allowed in step S35 the server sends the requested image file. If however in step S34B it is determined that access is not allowed, then the server will send a dummy file for display by the web page in step S34C. Such a dummy file can include a warning that access to the requested image file has not been allowed. Alternatively, if the file is a sound file, instead of the requested digitized sound, a sound file tranmitted could include a simple audio warning or statement that access to the requested file has been denied. A benefit of transmitting a dummy file instead of the requested file is that the size of the dummy file can be considerably smaller than the size of the requested file e.g. 1 Kbyte as opposed to 10's to 100's of Kbytes. This provides a bandwidth saving for the server.

In this way, a server is able to control access to its files over the internet. If a server is accessed directly e.g. by typing in a URL, then there will be no referrer address sent. In this case, the server can recognise that no referrer address has been sent and allow a predetermined level of access to files. For instance, a URL which has been directly entered could be a URL for an image file i.e. the user is attempting to directly down load an image file from the server. It can thus be predetermined whether such direct access is allowed by setting the level of access to files for file requests which do not have a referrer address associated with them.

The ability of a server containing image files, which can either be directly accessed or referred to by other servers, to identify the origin of the request for a file allows the server to provide a subscription service for access to files. The server can be segregated into areas that provide images for any subscriber, one particular subscriber only, subscribers paying for enhanced package, or anyone i.e. a free service. This control will also be beneficial to server owners who refer to other servers for files since owners of the servers containing the files would be encouraged to develop the library of files available to subscribers. Not all server owners would therefore need to generate their own library but can simply subscribe to the servers containing the desired files thereby gaining access to a large range of images, movies and sounds etc which can be incorporated into their web pages. This system also provides a platform for providing copyright protected images and sounds allowing authors or artists payment for their work. Further, the distribution of services over the internet in this manner allows for the efficient use of the internet since the server providing the

6

files to a referrer can be connected to the internet over a high bandwidth connection thus allowing other servers to be connected over low bandwidth connections. This makes efficient use of internet connections and avoids bottlenecks.

Referring now to FIG. 5, a second method is illustrated allowing the customisation of web pages depending on the route by which the web page is arrived at.

In FIG. 5 in step S40 the URL for the HTML file is input or selected by the user via the browser. The browser then requests connection to a server identified in the URL in step S41 and the browser connects to the server in step S42. The browser sends a request for the HTML file in step S43 and the server sends the HTML file in step S44. The browser then interprets the HTML file in step S45 and in step S46 the browser displays the web page. The web page displayed in step S46 will include text and hypertext links. Also, images can be included in the web page and can be retrieved from a server in a manner described hereinabove with reference to either the prior art FIG. 2, or FIGS. 3 or 4.

In step S47 it is determined whether another HTML file is requested by a user who has selected a hypertext link in the web page. If another HTML file is requested, the HTML file has a URL and in step S50 the browser requests connection to another server identified in the URL. The browser then connects to the other server in step S51 and in step S52 the browser sends a request for the HTML file. The server then looks at the referrer address which refers to the URL of the HTML file which is currently being displayed by the web page (step S46) and the server runs an application using the referrer address in step S54 and in step S55 the server generates a HTML file which is then sent in step S56 to the browser. The browser can then interpret the HTML file in step S45 and display a new web page in step S46.

In this method, since the server refers to the referrer address to determine which application to run, the HTML file sent to the browser can be customised in dependence upon the web page from which the request for a new web page was made. In this embodiment the server runs an application which takes in the referrer address and generates a new HTML file. However, an alternative method of sending a customised HTML file to the browser is illustrated in FIG. 6.

In FIG. 6 like reference numerals are used for the steps which are the same as those in FIG. 5. This method differs from FIG. 5 in that step S55 i.e. the generation of an HTML file is replaced with a step S57 of looking up an appropriate HTML file from a library of stored HTML files for referrer addresses.

Thus, the methods of FIGS. 5 and 6 allow a server to customise the web page displayed at a browser in dependence upon the previous web page. This would give the server an appearance of having some 'intelligence'.

FIG. 7 shows an internet server 3 according to the invention. The internet server 3 has an input 301 for receiving via the internet a file request from a user, for instance by means of a browser 1. The file request is passed to an identification signal determiner 302 which determines if the file request includes an identification signal identifying the origin of the file request. For instance, if the file request conforms to the hypertext transfer protocol, the file request may include the URL of the page being displayed on the user's screen. This URL is the identification signal determined by the unit 302.

A comparator 304 then compares the identified identification signal in the input file request with predetermined identification signals stored in a store 306. Whether or not

6,081,835

7

there is a match will determine which file stored in the file store **308** is transmitted to the user. The comparator **304** and the decision means **310** are controlled by a control unit **312**. The comparator **301** informs the decision means **310** of the result of the comparison. The decision means **310** then interrogates the store **206** to determine to which files access allowed. If access to the requested file is allowed, the file is retrieved from the file store **308** and then transmitted to the user via an output **314** and the internet. The control of the decision means **310** has been described at length with reference to FIGS. **3** to **6**.

The functional elements of the internet server may be implemented in hardware or software or a combination of both.

Although the present invention has been described with reference to specific embodiments, the present invention is not so limited and modifications which are clear to a skilled person in the art can be made without departing from the scope of the invention. In particular, the term "internet" is used generically and refers not only to an international interconnected network of computers and servers but also to other interconnected networks, for instance so-called intranets—interconnected networks internal to an organisation. Furthermore, the term "web" is not intended to limit implementation of the invention to WWW applications. The invention may also be applicable to FTP (File Transfer Protocol) and Telnet applications and other such future applications. This list is not intended to be exhaustive.

What is claimed is:

1. A method of operating a file server, said method comprising the steps of:

receiving a request for a file;

determining if the request includes a received identification signal identifying an originating file from which said request originated;

comparing any said received identification signal with one or more predetermined identification signals; and

deciding which file, if any, is to be supplied in dependence upon said determining and comparing steps, and if in the deciding step it is decided that a file is to be supplied, supplying said file.

2. A method as in claim **1** wherein said supplied file is supplied only if any said identification signal matches a said predetermined identification signal.

3. A method as in claim **1** wherein said supplied file is the same file as requested.

4. A method as in claim **1** wherein if any said identification signal does not match a said predetermined identification signal, said supplied file is not the same file as requested.

5. A method as in claim **1** including using a look up table which contains said one or more predetermined identification signals and which identifies at least one file which can be supplied in accordance with a predetermined identification signal.

8

6. A method as in claim **1** wherein said deciding step further comprises generating said supplied file.

7. A method as in claim **1** wherein said request conforms to a hypertext transfer protocol.

8. A method as in claim **7** wherein said received identification signal includes a universal resource location address for said origination from which the request originated.

9. A method as in claim **1** in which said file server is connected to the internet and wherein said request is received via the internet.

10. A file server comprising:

receiving means for receiving a file request;

determining means for determining if the file request includes an identification signal identifying an originating file from which said file request originated;

comparison means for comparing any said identification signal with at least one predetermined identification signals;

decision means responsive to said determining means and to said comparison means for deciding which file, if any, is to be supplied; and

an output means for supplying a file if said decision means decides that a file is to be supplied.

11. A file server as in claim **10** wherein said decision means is adapted to decide that a file is to be supplied only if said identification signal matches a predetermined identification signal.

12. A file server as in claim **10** wherein said decision means is adapted to decide that the file requested is to be supplied if said identification signal matches a predetermined identification signal.

13. A file server as in claim **10** wherein if said identification signal does not match a predetermined identification signal, a file other than that which was requested is supplied.

14. A file server as in claim **10** further comprising storage means for storing a look-up table containing said predetermined identification signals, said look-up table identifying at least one file which can be supplied in accordance with a predetermined identification signal.

15. A file server as in claim **10** wherein said deciding means further comprises generating means for generating a file to be supplied.

16. A file server as in claim **10** wherein the receiving means is adapted to receive file requests conforming to a hypertext transfer protocol.

17. A file server as in claim **16** wherein said identification signal and said predetermined identification signal include a universal resource address location for said originating file from which said file request originated.

18. A file server as in claim **10** in which said file server is connected to the internet and wherein said receiving means is adapted to receive said file request via the internet.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief of Plaintiff-Appellant Suffolk Technologies, LLC was served through the Court's ECF system and electronic mail on July 29, 2013 to counsel of record as follows:

Christa M. Anderson (canderson@kvn.com)
Steven A. Hirsch (shirsch@kvn.com)
Matthias A. Kamber (mkamber@kvn.com)
Robert Van Nest (rvn@kvn.com)
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111

*Counsel for Defendant-Appellee*
*Google Inc.*

Date: July 29, 2013

/s/ Joel L. Thollander
Joel L. Thollander

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of Plaintiff-Appellant Suffolk Technologies, LLC:

1.      complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B)(i). This brief contains 13,887 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b). Microsoft Word 2003 was used to calculate the word count.

2.      complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2003 in 14-point Times New Roman type style.

Date: July 29, 2013

/s/ Joel L. Thollander
Joel L. Thollander